THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEITH M. BRETON, Defendant-Appellant.

Second District   No. 2—91—0087

Opinion filed November 20, 1992.

G. Joseph Weller and Thomas A. Lilien, both of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant, Keith Breton, was convicted of solicitation of murder for hire (Ill. Rev. Stat. 1989, ch. 38, par. 8—1.2) and sentenced to a

term of 30 years' imprisonment following a jury trial in the circuit court of Du Page County.

On appeal, defendant raises the following issues: (1) whether the State failed to prove the "agreement" element of its charge of solicitation of murder for hire; (2) whether the trial court erred in admitting prejudicial evidence of other crimes; (3) whether the trial court erred by allowing the State to impeach a witness on a collateral issue; (4) whether prosecutorial misconduct denied the defendant a fair trial; and (5) ineffective assistance of counsel.

The following facts are relevant to our disposition of the issues raised on appeal. The defendant sold cocaine to Gary Wehrmeister at least 20 times between 1980 and 1989. On March 2, 1989, Wehrmeister purchased cocaine from the defendant to resell to a customer, Hogan, who was cooperating with law enforcement authorities. At that time, Wehrmeister was unaware that Hogan was cooperating with law enforcement authorities.

After Wehrmeister delivered the drugs purchased from the defendant to Hogan, authorities, who had been monitoring the transactions, arrested both Wehrmeister and the defendant. The defendant was charged with drug and weapons offenses and incarcerated in the Du Page County jail, where he remained pending trial.

Wehrmeister initially refused to cooperate with authorities in their case against the defendant. However, after learning that the defendant told authorities Wehrmeister was the supplier of the drugs sold to Hogan, Wehrmeister agreed on June 5, 1989, to cooperate with authorities against the defendant and testify against him at his trial scheduled for June 22, 1989. Defendant first became aware of this on June 5, 1989.

On June 12, 1989, John Bivins, a fellow inmate of defendant, advised the State's Attorney's office through his attorney that the defendant was looking for a hit man to kill Wehrmeister. Bivins later met with authorities and gave them two maps and two notes written by the defendant. Bivins told the authorities the maps and notes were to be used by the hit man. The maps showed the location of Wehrmeister's home. The notes threatened both Wehrmeister and Hogan.

The Du Page County State's Attorney's office implemented a plan to allow defendant to contact an undercover investigator posing as a hit man. State's Attorney investigators gave Bivins an untraceable undercover phone number which Bivins gave to defendant. With State's Attorney approval, Bivins also gave defendant the names "Dan" and "Bob" as persons defendant could call at the undercover number to arrange a hit. State's Attorney investigators Dan Callahan

and Bob Holguin would answer the phone and pose as hit men. Bivins did not testify at the trial after it was determined that he would assert his fifth amendment privilege if called to testify.

Between June 15, 1989, and June 22, 1989, defendant made five phone calls to the undercover phone number. Law enforcement authorities tape-recorded the first four of these phone calls with judicial approval. During the four tape-recorded calls, defendant spoke with undercover State's Attorney investigator Dan Callahan, who posed as a hit man.

Defendant first called Callahan at the undercover phone number on June 15, 1989. During the conversation Callahan asked defendant what he wanted. Defendant responded "I gotta have a job done." Defendant stated the job involved "a guy" whom he identified as Gary Wehrmeister. When Callahan asked defendant what he wanted done to Wehrmeister defendant replied "I want him out. I only got about five days. He goes to trial. *** He's gotta go." Defendant indicated that Wehrmeister had set him up for a drug charge, that he was not guilty, but that he did not want to take a chance of Wehrmeister testifying against him.

Also during the first call, defendant agreed to pay Callahan $5,000 for Wehrmeister's murder with $2,500 up front. Defendant stated he would need a day to make arrangements for the delivery of the up-front money. Defendant told Callahan he would call him the next day to further discuss the delivery of the up-front money.

Defendant called Callahan at the undercover phone number for the second time on June 16, 1989. Defendant told Callahan the up-front money was coming from out of town and Callahan could pick it up from Ken Drost, an attorney, at his downtown Chicago office. Defendant instructed Callahan to tell Drost he was an investigator there to pick up an envelope. Defendant also supplied Callahan with information to facilitate the murder of Wehrmeister. This occurred after Callahan told defendant "when your [sic] payin' me to kill somebody I need to know everything I can." In response, defendant told Callahan where Wehrmeister lived, discussed Wehrmeister's habits, and described Wehrmeister's living arrangements.

Defendant made his third call to Callahan at the undercover number on June 19, 1989. Defendant told Callahan the up-front money was available and gave Callahan Drost's phone number. Defendant stated Drost would have the money in an envelope. Defendant also instructed Callahan he should tell Drost he was an investigator working on something for Keith (the defendant) if Drost asked what the money was for.

At defendant's request, defendant's wife had sent $2,500 in the form of a money order to Drost. On June 20, 1989, Callahan went to Drost's office and met Drost. At that time Drost endorsed the money order and delivered it to Callahan for the defendant.

Defendant made his fourth call to Callahan on June 21, 1989. Callahan told defendant he received the money order from Drost and expressed concern that a paper trail had been established. Defendant replied that he had told Drost to cash the money order and give Callahan cash. Callahan told defendant Wehrmeister's murder was "set for tonight." Defendant told Callahan he could pick up the rest of the money from Drost the next day.

On June 22, 1989, State's Attorney investigator Bob Holguin talked to the defendant by phone when the defendant called the undercover phone number and asked for "Dan." Holguin told the defendant he was "Bob." The defendant asked if Holguin knew whether Wehrmeister had gone to court and Holguin replied that he had not. The defendant said "Good" and asked whether Wehrmeister was taken care of. Holguin answered yes and said that Wehrmeister would never go to court. The defendant said the rest of the money would be available on Friday.

At his trial, defendant contended he did not really intend to have Wehrmeister murdered. He testified he wrote the maps and threatening notes to get Wehrmeister to submit an affidavit in May 1989 before he even knew Wehrmeister was going to testify against him. Defendant testified that he subsequently destroyed the original maps and notes. Bivins had given the authorities copies which defendant did not know Bivins had. Defendant also testified that after he discovered the hit man was a phony he went along with the scheme knowing no one would really be hurt. Defendant conceded that going along with the scheme was irrational and self-destructive. He said he felt angry, betrayed and frustrated and was overcome by an uncontrollable desire to pose as a bad person to "expose" the State's Attorney.

Defendant first contends that his conviction must be reversed because the State failed to prove the "agreement" element of its solicitation of murder for hire charge. This is an issue of first impression. We have found no previous case construing the term "agreement" in the solicitation of murder for hire statute.

Solicitation of murder for hire is an offense created by statute in 1988. Section 8—1.2(a) of the statute provides:

> "A person commits solicitation of murder for hire when, with the intent that the offense of first degree murder be committed, he procures another to commit that offense pursuant to

any contract, agreement, understanding, command or request for money or anything of value." Ill. Rev. Stat. 1989, ch. 38, par. 8—1.2(a).

The State charged defendant with solicitation of murder for hire pursuant to an agreement. The agreement in question was between defendant and Callahan. The State did not charge defendant with solicitation of murder for hire pursuant to any of the other elements of the statute. The State argues that the term "any" in the statute means a defendant may be found guilty of solicitation of murder for hire if the solicitation is pursuant to any of the elements in the statute. We do not address that question here.

The issue in this case involves the "agreement" between defendant and Callahan, an undercover government agent who only feigned agreement with the defendant (Callahan of course did not really intend to murder Wehrmeister). The jury found defendant guilty of solicitation of murder for hire pursuant to an agreement between defendant and Callahan. Defendant contends his conviction cannot stand because Callahan's feigned agreement does not satisfy the "agreement" element of the solicitation of murder for hire charge.

Defendant argues that the issue is analogous to a similar issue in conspiracy law in Illinois. He contends that, like the conspiracy statute, at least two parties must reach an actual agreement (both parties must really intend to do what they agree to do) to satisfy the agreement element of the solicitation of murder for hire statute. Defendant argues that since Callahan only feigned agreement, there was no solicitation of murder for hire pursuant to an agreement as charged here.

Defendant correctly argues that a conspiracy conviction requires the actual agreement of at least two parties to the conspiracy. A conspiracy conviction in Illinois requires an agreement based on the bilateral theory of conspiracy rather than the unilateral theory of conspiracy. (*People v. Foster* (1983), 99 Ill. 2d 48.) An agreement based on the bilateral theory is one between a defendant and at least one other person where both parties actually intend to agree (a bilateral agreement). (*Foster*, 99 Ill. 2d at 55.) Under the bilateral theory of conspiracy, a purported agreement between a defendant and a government agent only feigning agreement will not support a conspiracy conviction because there is no actual agreement and actual agreement is a necessary element of conspiracy. *Foster*, 99 Ill. 2d at 50.

An agreement between a defendant and a governmental agent only feigning agreement is an agreement based on the unilateral theory. (See Burgman, *Unilateral Conspiracy: Three Critical Perspec-*

*tives,* 29 De Paul L. Rev. 75 (1979).) In such a unilateral agreement only one person actually intends to agree.

If conspiracy law requiring a bilateral agreement applies to solicitation of murder for hire pursuant to an agreement as defendant contends, then defendant is correct that the facts of this case could not support a conviction because in this case there was only a unilateral agreement. The question is whether conspiracy law and the bilateral theory of conspiracy should apply to the solicitation of murder for hire statute to require a bilateral agreement when the solicitation is pursuant to an agreement.

Defendant reasons that the bilateral theory applies to both conspiracy and solicitation of murder for hire when pursuant to an agreement because they are similar inchoate crimes. Defendant also maintains that they are the only inchoate crimes with an agreement element and therefore the agreement element must be construed the same in both statutes.

The State counters that defendant's analogy of the solicitation of murder for hire statute to conspiracy is flawed. The State argues that the analogy ignores fundamental differences between solicitation and conspiracy.

■ There are fundamental differences between solicitation and conspiracy. Solicitation can be thought of as an attempted conspiracy. (Model Penal Code §5.02, Comment, at 365 (Official Draft & Revised Comments 1985).) Solicitation generally requires a command, encouragement, or request of another to commit a crime (in solicitation of murder for hire it is the procurement of another). Conspiracy requires an agreement to commit a crime and an overt act in furtherance of the agreement. (*People v. Moorehead* (1984), 128 Ill. App. 3d 137, 141.) Neither solicitation nor conspiracy is a lesser included offense of the other. (128 Ill. App. 3d at 141.) Solicitation and conspiracy each have a different *actus reus.* (2 W. LaFave & A. Scott, *Substantive Criminal Law* §§6.1, 6.4 (1986).) The *actus reus* of conspiracy is an agreement to commit a crime while the *actus reus* of solicitation involves an attempt to persuade another to commit a crime. See Robbins, *Double Inchoate Crimes,* 26 Harv. J. on Legis. 1, 29-30 (1989).

In its decision holding that the bilateral theory applies to conspiracy, the Illinois Supreme Court recognized that solicitation and conspiracy are different. In addressing the issue of whether the bilateral theory should apply to the conspiracy statute, the court noted the different natures of solicitation and conspiracy when it said "Illinois does have a solicitation statute which embraces virtually every situation in which one could be convicted of conspiracy under the unilat-

eral theory." (*Foster*, 99 Ill. 2d at 53.) The court also commented that there was little need to adopt a unilateral theory of conspiracy because of the solicitation statute. *Foster*, 99 Ill. 2d at 53.

Because solicitation statutes embrace situations in which one could be convicted of conspiracy under the unilateral theory, solicitation statutes do not require bilateral agreements. Although the charge of solicitation of murder for hire pursuant to an agreement uses the same term, "agreement," as the conspiracy statute, there is no reason to construe the terms the same in both statutes. Because of the nature of solicitation, the solicitation statute is based on the unilateral theory, which only requires actual agreement by one of the parties.

If actual agreement by both parties was required and the procurement element was satisfied the elements of a conspiracy would be satisfied (a bilateral agreement plus an overt act in furtherance of the agreement). Requiring a bilateral agreement in the solicitation of murder for hire statute when the solicitation was pursuant to an agreement would effectively require a conspiracy. We do not believe the legislature intended to require proof of the elements of a conspiracy in order to prove a solicitation of murder for hire charge. This view is borne out by our supreme court's comments with respect to solicitation in *Foster*.

We conclude that the solicitation of murder for hire statute does not require actual agreement between a defendant and another when the solicitation is pursuant to an agreement. Procurement of another to commit murder pursuant to an agreement where a defendant agrees with a government agent feigning agreement is sufficient to support a conviction of solicitation of murder for hire.

In his second contention on appeal, defendant argues he was unduly prejudiced by the admission at trial of excessive detail concerning his underlying drug and weapons cases. Despite the general rule against admission of prior crimes evidence, defendant concedes that some evidence of defendant's prior crimes was relevant to demonstrate defendant's alleged motive for the solicitation of murder for hire. However, defendant argues that unnecessary detail allowed the State to portray the defendant as a drug dealer which improperly influenced the jury's verdict.

Defendant maintains the improper excessive detail concerned his drug deal with Wehrmeister, which occurred on March 2, 1989, and was the basis of defendant's arrest and conviction on drug and weapons charges. Defendant specifically objects to the admission of items of physical evidence from the drug case, such as packages of cocaine and a gun received by the defendant as partial payment for the co-

caine. Defendant also objects to the admission of tape-recorded conversations and a tape-recorded drug transaction between Wehrmeister, the alleged victim of the solicitation of murder for hire, and Hogan, the customer who cooperated with authorities which resulted in defendant's arrest for the drug charge.

Defendant also maintains that admission of evidence concerning Wehrmeister's prior relationship with defendant was prejudicial error. Wehrmeister was allowed to testify that he had known the defendant since 1980 and had purchased cocaine from the defendant at least 20 times between 1980 and 1989. Defendant argues that the admission of this evidence was improper because it allowed the State to portray the defendant as a drug dealer.

Evidence of other crimes is admissible if submitted to show any relevant purpose other than propensity. (*People v. Hayes* (1990), 139 Ill. 2d 89, 145.) Proof of the presence of a motive which would lead the defendant to commit the offense charged is always relevant and may be admitted. (*People v. Whitlock* (1988), 174 Ill. App. 3d 749, 772.) Relevant evidence is admissible that even to a slight degree establishes the existence of a motive. (*People v. Stewart* (1984), 105 Ill. 2d 22, 56.) It is within the discretion of the trial court to decide whether prior crimes evidence is relevant and admissible, and the trial court's decision will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to the defendant. *Hayes*, 139 Ill. 2d at 130.

■■ We find that the trial court did not abuse its discretion in admitting the evidence in question. Defendant admits the general relevance of the evidence to show a motive for the solicitation of murder for hire and only disputes the admission of excessive detail or excessive numbers of prior crimes admitted.

Here, each contested item of evidence could be said to advance the State's motive theory. Evidence of the March 2, 1989, drug deal not only established the factual scenario that gave rise to the solicitation but also provided the jury with the defendant's motive for the solicitation. The detail of the evidence allowed was relevant to establish the actual relationships among the parties and to refute defendant's denial of the drug charge which is directly related to his alleged motive for solicitation. The evidence showed how the defendant came to feel he was "set up," ultimately motivating him to solicit the murder of his codefendant.

The number of prior dealings with Wehrmeister is relevant to the defendant's motive because it shows the defendant stood to lose an ongoing drug trade if he was convicted. A supplier of drugs in a se-

ries of transactions may have a stronger motive to solicit the murder of someone who sets him up than a supplier of drugs in a single transaction. A drug dealer may feel the need to send a message to other customers not to cooperate with law enforcement authorities.

The record shows that the trial court carefully considered the probative and prejudicial weight of the evidence and to some extent limited the evidence admitted. We conclude the defendant was not denied his right to a fair trial by the admission of excessive detail or number of prior crimes evidence.

Defendant next alleges the trial court erred by allowing the State to impeach its own witness, Kenneth Drost, on a collateral matter. Drost was defendant's former attorney who delivered the down payment for the hit to Callahan, an undercover investigator posing as a hit man.

On direct examination, Drost testified that defendant had previously tried to borrow money from him while defendant was incarcerated in order to bail out another inmate, McVickers. Drost was unable to recall the reason defendant had given him for wanting to bail McVickers out. The State followed Drost's testimony with that of Callahan. Callahan testified that Drost told him during a prior interview that defendant had told Drost he wanted to bail McVickers out because McVickers had been talking to the State's Attorney about defendant's drug case and defendant wanted McVickers out of the picture.

Defendant argues that his reason for wanting McVickers out of jail is a collateral matter which should not have been impeached. Defendant contends that the State only impeached Drost to impugn the defendant by suggesting to the jury that he intended to commit another crime such as obstruction of justice.

The State counters that the matter was not collateral. It contends that the matter had probative value with respect to the solicitation of murder for hire charge.

A witness may not be impeached on a collateral matter. (*People v. Collins* (1985), 106 Ill. 2d 237, 269.) The test to determine if a matter is collateral is whether the matter could be introduced for a purpose other than contradiction. (*People v. Byer* (1979), 75 Ill. App. 3d 658, 669.) The application of the "collateralness" test is a matter within the reasonable discretion of the trial court, and a reviewing court should not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant. *Collins*, 106 Ill. 2d at 269.

■ Here, the trial court, after side-bar arguments, made a specific ruling that the matter was not collateral. The facts show that during the defendant's calls to Callahan, an undercover investigator posing as a hit man, the defendant asked Callahan whether he had been contacted by McVickers. Thus, defendant raised the issue of the role of McVickers in the solicitation scheme. The trial court could reasonably conclude that the State's effort to show why the defendant wanted to bail McVickers out was directly related to the charge before the court. Accordingly, we find the trial court's ruling was not an abuse of discretion.

Defendant next argues that he was denied a fair trial because of several instances of prosecutorial misconduct. Defendant also asserts that the plain error rule should apply if the prosecutorial misconduct issue is deemed waived.

■ We find that defendant did not object to all of the alleged instances of prosecutorial misconduct at trial and did not preserve any of the alleged instances in a post-trial motion and thus the issue is waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 190.) We also find that the plain error exception to the waiver rule does not apply in this case because our review of the record satisfies us that any error in the form of prosecutorial misconduct as alleged by the defendant did not rise individually or cumulatively to the level of substantial prejudice to the defendant. *People v. Smith* (1990), 141 Ill. 2d 40, 60.

Defendant's final contention on appeal is ineffective assistance of counsel. Specifically, defendant argues that his counsel: (1) failed to object and preserve for review the erroneous admission of other crimes evidence; (2) failed to object to improper comments by the prosecutor in closing arguments; and (3) presented a closing argument inconsistent with the defendant's own testimony on the issue of intent.

■ Because we concluded earlier that there was no prejudicial error with respect to the admission of prior crimes, we will not discuss that issue further here. Neither will we elaborate on our conclusion that the alleged instances of prosecutorial misconduct did not amount to prejudicial error.

Defendant contends that his counsel's closing argument, despite defendant's repeated denials that he ever had the intent to kill by solicitation for murder, conceded that the defendant had the requisite intent. Defendant argues his counsel conceded defendant had the requisite intent in defendant's early dealings with Bivins, the fellow inmate who subsequently cooperated with the State's Attorney's office. Counsel argued that the defendant only changed his mind after he re-

alized he was being duped. Defendant maintains that his counsel's error was tantamount to an admission of guilt. Defendant argues this error was aggravated when the prosecution pointed out the inconsistency during its rebuttal argument.

To prevail on a claim of ineffective assistance of counsel, a defendant must establish that (1) counsel's representation fell below an objective standard of reasonableness and (2) there is a reasonable probability that but for counsel's errors the result of the proceeding would have been different. (*People v. Albanese* (1984), 104 Ill. 2d 504, 525, citing *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) A reviewing court's scrutiny of trial counsel's performance must be highly deferential with a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. (*People v. Johnson* (1989), 128 Ill. 2d 253, 266.) Ineffective assistance of counsel claims may be disposed of on the ground that the defendant suffered no prejudice from the claimed errors without deciding the first part of the *Strickland* standard (whether the errors were serious enough to constitute less than reasonably effective assistance). *Johnson*, 128 Ill. 2d at 271.

■ Here, based on the evidence presented by the State, a jury could have found beyond a reasonable doubt that the defendant was guilty of solicitation of murder for hire. The State's evidence consisted of the following: establishment of a motive for the crime (shortly before defendant's drug trial his codefendant, Wehrmeister, decided to testify against him); a fellow inmate of the defendant advised the State's Attorney that defendant was looking for a hit man to kill Wehrmeister; the defendant wrote maps which could lead a hit man to Wehrmeister; undercover State's Attorney investigators Callahan and Holguin posed as hit men; defendant called Callahan four times and these calls were taped; during the four calls to Callahan, defendant clearly requested Callahan to murder Wehrmeister and agreed to a price of $5,000 for the murder with a down payment of $2,500; the defendant arranged for and made delivery of the down payment to Callahan; and in a final conversation between the defendant and Holguin after the date of the intended murder, defendant expressed satisfaction that the murder had apparently occurred and told Holguin the balance of the money for the murder was available.

Defendant's testimony concerning this apparent solicitation of murder for hire is simply not credible. Defendant testified that he never intended to solicit for the murder of Wehrmeister. He maintained that he discovered that the hit man phone number was really a State's Attorney phone number and concluded the scheme was a ruse

but went along with the scheme to "expose" the State's Attorney's office. Defendant testified he had an uncontrollable desire to expose the State's Attorney by acting like a bad person. However, defendant's contentions are belied by evidence that the phone number was not traceable. In addition, defendant offered no credible evidence to establish a basis for wanting to expose the State's Attorney nor any evidence of a direct attempt to do so. Finally, defendant's own actions, his payment of a substantial sum to Callahan, a purported hit man, and his expression of satisfaction and instructions for the hit man to get the balance of the money upon being informed that the murder had occurred, belie his whole exposure theory.

Based on this overwhelming evidence of defendant's guilt, we conclude that even if defense counsel's conduct amounted to less than reasonably effective assistance, defendant was not prejudiced because the outcome of the trial would not have been different if counsel's conduct was different. Thus defendant has not satisfied the second prong of the *Strickland* test. Accordingly, defendant's allegation of ineffective assistance of counsel fails.

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

WOODWARD and McLAREN, JJ., concur.