THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAMARIS CUADRADO, Defendant-Appellant.

First District (4th Division)    No. 1—02—1092

Opinion filed June 26, 2003.—Rehearing denied August 11, 2003.

Frederick F. Cohn, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Joan F. Frazier, Assistant State's Attorneys, of counsel), for the People.

JUSTICE KARNEZIS delivered the opinion of the court:

Following a jury trial, defendant Damaris Cuadrado was convicted of solicitation of murder for hire in violation of section 8—1.2 of the Criminal Code of 1961 (720 ILCS 5/8—1.2 (West 1998)) and was sentenced to 25 years' imprisonment. She now appeals and asserts numerous errors[1] requiring reversal of her conviction including: (I) the trial court erroneously denied her motion to dismiss the indictment; (II) her conviction is invalid because the evidence is insufficient as a matter of law; and (III) she was denied her right to confront State witness Benjamin Jiminez. We affirm.

## BACKGROUND

Benjamin Jiminez (Benjamin) testified that he met defendant for the first time in September 1997 when he was introduced to her by Pedro Trinidad. Benjamin pulled up to Trinidad's house and Trinidad approached Benjamin's car and told Benjamin that defendant was looking for someone to kill her husband. Benjamin agreed to speak with defendant.

Defendant got into Benjamin's car and told Benjamin that she wanted her husband murdered because he was abusive. Benjamin noticed that defendant was upset but inquired why defendant did not just divorce her husband. Defendant responded that her husband had threatened to take their son away from her and she did not want to take that chance. Defendant then offered to pay Benjamin $10,000. Benjamin said he would look into it. Benjamin gave defendant his pager number and the two agreed to meet again.

A week later, defendant paged Benjamin and set up a meeting. Prior to their meeting, Benjamin set up a microcassette recorder in his car with the hope that he would be able to record his conversation with defendant. Once defendant was inside the car, Benjamin pretended that he forgot defendant's name so that she would say it for the tape, which she did. Benjamin verified that defendant did not want her husband beaten, but wanted him killed. Defendant replied

---

[1]Defendant presents a total of 21 issues on appeal. Because our court is bound by administrative order of the Illinois Supreme Court limiting the length of our opinions to 20 pages, we have chosen to publish only the portions of our original 40-page Rule 23 decision discussing the sufficiency of the indictment, the sufficiency of the evidence, and the defendant's right to confrontation. We do so mainly because the defendant raises such unique arguments that have not been addressed previously by this court. They, therefore, fall within the purview of the rules guiding published opinions. 166 Ill. 2d R. 23. The remaining issues have been excluded from publication. The complete Rule 23 decision can be found in the office of the clerk of this court.

that she needed him "gone" and wanted him "out of the picture." Benjamin again told defendant that he would look into it but had not found anybody yet.

After the meeting, Benjamin wanted to make a copy of the tape. He went to his mother, who worked for a security firm, to see if she had the right equipment. She did not, but inquired about the contents of the tape. Benjamin explained to his mother that the tape contained a conversation with a woman who was attempting to hire someone to kill her husband. Benjamin explained that he was going to blackmail defendant with the tape. Benjamin's mother listened to the tape and warned her son not to get involved.

In early December 1997, defendant paged Benjamin and they met. They talked about whether Benjamin had found anyone to kill her husband and Benjamin said he had not. Sometime after December 14, 1997, defendant again paged Benjamin and told him not to worry about looking for someone.[2]

The two met shortly thereafter and defendant told Benjamin that she had already had the job done. Benjamin then informed her that he had secretly tape recorded their earlier conversation. Benjamin then told defendant that even though the job had already been done, he wanted money or he would go to the police with the tape. Defendant told Benjamin that she did not have the money because she had just paid the person "to do it" but that she would work on getting it.

Thereafter, defendant gave Benjamin $3,000 in cash and demanded the tape. Benjamin told defendant he would give her the tape when she gave him more money. Two days later, defendant gave Benjamin an additional $1,000 in cash. Benjamin then let defendant listen to the tape. After listening to the tape, defendant tore up the tape and threw it into a sewer. Defendant then told Benjamin that she would meet with him one more time and give him more money.

On May 22, 1998, defendant and Benjamin agreed to meet. Defendant failed to appear for the meeting so Benjamin went to defendant's house and stood across the street. Defendant approached Benjamin and told him that she did not have the money yet. As the two were talking, a man approached. Defendant introduced him as her boyfriend, Darryl Mitchell. He and Benjamin shook hands. Defendant told Benjamin she would meet him later.

The next day, defendant paged Benjamin and told him to meet her. They met and defendant told Benjamin to follow her in his car so she

_____

[2]Defendant's husband Edgardo Cuadrado was in fact shot and killed on December 14, 1997, after he left church services to check on his car when his alarm sounded.

could get his money. After driving for a time, defendant stopped her car at 57th and Sawyer. Both defendant and Benjamin exited their vehicles. Defendant told Benjamin to wait while she got the money. After Benjamin got back into his car, Darryl Mitchell and another man approached and started shooting at him. Benjamin was shot in the spine and was instantly paralyzed.

Subsequently, Benjamin was hospitalized and spent three months in rehabilitation. In mid-June 1998, he told his mother what had happened and she called detectives, who took Benjamin's statement and showed him numerous photographs. He identified Darryl Mitchell as the person who shot him. He also later identified Mitchell in a lineup.

On October 21, 1998, police conducted a confidential overhear of a telephone call Benjamin made to defendant. During that conversation, defendant attempted to pretend that she was someone other than Damaris Cuadrado, but eventually exposed her real identity when Benjamin mentioned that he had another copy of the tape. During that conversation, defendant denied killing her husband but agreed to meet Benjamin the next day. Benjamin did not appear for the meeting.

Teresa Jiminez (Teresa), Benjamin's mother, testified she listened to the microcassette tape that Benjamin had in September or October of 1997. On that tape, she heard her son's voice and another female voice but did not recognize the female voice. Shortly after she heard the tape, she saw her son with a bundle of hundred dollar bills although her son did not have a job.

Teresa also testified that she was present when there was a confidential overhear of a conversation between her son and defendant in October 1998. She subsequently listened to that tape and recognized the female voice as the same voice on the tape that her son had played for her.

After her son was shot, he initially told her that he had been shot by gangbangers. However, in the middle of June 1998 Teresa called the police after having a conversation with her son wherein Benjamin told her that defendant had him shot and that he did not want her to get away with it.

Later at the police station, Teresa heard police questioning someone in the other room. Teresa testified that she recognized the voice as the woman she had heard on Benjamin's tape and during the interception of a private communication.

Detective John Murray of the Chicago police department testified that on December 14, 1997, he was assigned to investigate a homicide. When he arrived at the scene, he observed a Hispanic male, identified as Edgardo Cuadrado, lying facedown on the grass. It appeared that he had been shot several times. Defendant was interviewed and did not mention Benjamin Jiminez or any recording.

On June 17, 1998, Detective Murray received a telephone call from Teresa Jiminez. He and his partner went to the Schwab Rehabilitation Institute and spoke with Benjamin and his mother. As a result of his conversations, Detective Murray contacted postal inspector Kevin O'Brien at the United States Post Office and requested a series of photographs from employment identification cards. Benjamin later identified a photograph of Darryl Mitchell from the United States Post Office employment identification photographs.

On October 21, 1998, Detective Murray obtained a court order allowing him to record a conversation between Benjamin and defendant. The equipment was set up at Benjamin's mother's condominium. Two calls were placed to defendant's home wherein Benjamin spoke with defendant. Those calls were tape-recorded. Teresa and Benjamin listened to the tape.

Surveillance was set up around defendant's Palos Hills condominium and several other addresses where defendant was known to visit. Defendant later voluntarily came to the police station.

Lawrence Rusinyak, vice-president of the claims department with Primerica Life Insurance Company, also testified. He testified that a life insurance policy in the amount of $240,000 had been issued to Edgardo Cuadrado in 1995, with his wife, defendant, as the primary beneficiary. The $240,000 was paid out on January 29, 1998.

At the close of all the evidence, a jury found defendant guilty of solicitation of murder for hire. She was sentenced to 25 years' imprisonment. It is from this judgment that defendant now appeals.

## ANALYSIS

### I. Sufficiency of the Indictment

Defendant first challenges the sufficiency of the indictment in this case and argues that it fails to state an offense as required by section 111—3(a) of the Code of Criminal Procedure of 1963. 725 ILCS 5/111—3(a) (West 1998).

■ Defendant was convicted of solicitation of murder for hire in violation of section 8—1.2 of the Criminal Code of 1961. 720 ILCS 5/8—1.2 (West 1998). Section 8—1.2 states that a person commits the offense of solicitation of murder for hire when he or she, "with the intent that the offense of first degree murder be committed, he *procures* another to commit that offense pursuant to any contract, agreement, understanding, command or request for money or anything of value." (Emphasis added.) 720 ILCS 5/8—1.2 (West 1998). The charging instrument in the instant case reads:

"DAMARIS CUADRADO *** committed the offense of SOLICITATION OF MURDER FOR HIRE in that [SHE], WITH THE

INTENT THAT THE OFFENSE OF FIRST DEGREE MURDER BE COMMITTED, TO WIT: THAT EDGARDO CUADRADO BE KILLED, *SOLICITED* BENJAMIN JIMINEZ TO COMMIT SAID MURDER, PURSUANT TO AN AGREEMENT OR CONTRACT FOR MONEY IN VIOLATION OF CHAPTER 720, SECTION 5/8— 1.2 OF THE ILLINOIS COMPILED STATUES, 1994, AS AMENDED, AND contrary to the Statute, and against the peace and dignity of the same People of the State of Illinois." (Emphasis added.)

Defendant's argument regarding the sufficiency of the indictment centers around the State's substitution of the word "solicit" for the word "procure." Because the statute contains the word "procure" and the State charged "solicit," defendant maintains, the charging instrument fails to state an essential element of solicitation of murder for hire.

■ A criminal defendant has a fundamental right under both the United States Constitution (U.S. Const., amend. VI) and the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 8) to be apprised of the " 'nature and cause' of criminal accusations made against him." *People v. DiLorenzo*, 169 Ill. 2d 318, 321, 662 N.E.2d 412, 413 (1996). In accordance with this fundamental right, Illinois law provides that an indictment must be in writing and allege the commission of an offense by: (1) stating the name of the offense; (2) citing the statutory provision that is alleged to have been violated; and (3) setting forth the nature and the elements of the offense charged. 725 ILCS 5/111— 3(a)(3) (West 2000).

■ When a defendant is challenging the sufficiency of an indictment on appeal, it is necessary to establish whether the defendant initially challenged the indictment in the lower court. This is important in order to determine which standard of review must be applied in determining the sufficiency of the indictment on appeal.

> "When an indictment or information is attacked for the first time on appeal, it is sufficient that the indictment or information 'apprised the accused of the precise offense charged with sufficient specificity to prepare his defense and allow pleading a resulting conviction as a bar to future prosecution arising out of the same conduct.' [Citations.] In other words, the appellate court should consider whether the defect in the information or indictment prejudiced the defendant in preparing his defense. If, however, the information or indictment is attacked before trial, *** the information must strictly comply with the pleading requirements of [section 111—3(a) of] the Code of Criminal Procedure of 1963. [Citations.]" *People v. Thingvold*, 145 Ill. 2d 441, 448, 584 N.E.2d 89, 91 (1991), quoting *People v. Gilmore*, 63 Ill. 2d 23, 29, 344 N.E.2d 456, 459 (1976).

The indictment in question here was challenged neither before trial nor for the first time on appeal. Defense counsel did not object to the indictment until after the culmination of the State's case and after she had filed a motion for a directed verdict. Nevertheless, defendant asserts that we review her challenge to the sufficiency of the indictment by determining whether the indictment strictly complies with section 111—3.

Our supreme court, in *People v. Benitez*, 169 Ill. 2d 245, 661 N.E.2d 344 (1996), was faced with a similar issue when the defendant raised a challenge to the sufficiency of the indictment two days into trial. The State's Attorney, after receiving a true bill from the grand jury, prepared an indictment charging defendant Benitez and two other codefendants with murder, attempted murder, aggravated battery and armed violence.

During the time between the filing of the indictment and Benitez's arraignment, the State's Attorney's office determined that the indictment was defective because it did not charge Benitez or another codefendant with any offenses and it erroneously identified a grand jury witness as the victim. *Benitez*, 169 Ill. 2d at 246-47, 661 N.E.2d at 345. Rather than following proper procedure, secretaries at the State's Attorney's office amended the indictment so that it charged Benitez and his codefendant with murder, attempted murder, aggravated battery and armed violence and so that it stated the correct victim. This amended indictment was not signed by the grand jury foreperson or the State's Attorney. *Benitez*, 169 Ill. 2d at 247, 661 N.E.2d at 345-46. At Benitez's arraignment, his attorney received a copy of the amended indictment although he presumed it was the original indictment. *Benitez*, 169 Ill. 2d at 247, 661 N.E.2d at 345-46.

Thirteen months later, on the second day of trial, defense counsel alerted the court that he had just become aware of the original indictment and that the original indictment did not name his client as a defendant. Defense counsel stated that he wished to obtain the original document and the grand jury transcript to confirm whether the grand jury had returned an indictment against his client, but he agreed to allow the trial to proceed with the understanding that he was "not waiving anything." *Benitez*, 169 Ill. 2d at 247-48, 661 N.E.2d at 346. The issue was revisited later during trial and the court ruled that the second indictment, naming Benitez, was valid. The defendant was found guilty of first degree murder and aggravated battery. *Benitez*, 169 Ill. 2d at 248, 661 N.E.2d at 346.

In his posttrial motion, the defendant challenged his convictions, claiming that they resulted from a void and invalid indictment. The court held an evidentiary hearing. The State argued that there had

merely been a mistake in the paperwork and asked the court to disregard the first indictment and to find the second indictment valid. At the conclusion of the hearing, the court found that the second indictment was valid as it properly charged and informed defendant of the nature and the elements of the charges against him. *Benitez*, 169 Ill. 2d at 248-50, 661 N.E.2d at 346-47. This court affirmed the findings of the circuit court (*People v. Benitez*, 269 Ill. App. 3d 182 (1994)), and our supreme court granted leave to appeal.

Before our supreme court, defendant challenged his convictions on the ground that the State failed to charge him with an offense. In considering the defendant's claim, our supreme court looked at both the original and the amended indictments. With respect to the amended indictment, the court chided the State's Attorney's office for failing to follow accepted methods for altering an indictment and ultimately found that the second indictment was not valid as to Benitez. In addition, the court rejected the State's argument that the original indictment was "merely a mistyped, superfluous document" that erroneously omitted the defendant's name. *Benitez*, 169 Ill. 2d at 255, 661 N.E.2d at 349. The court ultimately ruled that because the initial indictment failed to name defendant and the second indictment was invalid, defendant was never properly charged with any offense. *Benitez*, 169 Ill. 2d at 255, 661 N.E.2d at 349.

Furthermore, the *Benitez* court recognized that the time at which defendant challenges a charging instrument on the basis that it fails to state an offense is significant in determining whether that defendant is entitled to reversal of his conviction on that ground. *Benitez*, 169 Ill. 2d at 257, 661 N.E.2d at 350. Because counsel objected to the indictment two days into the trial, Benitez's challenge to the indictment did not fall into either of the rules previously announced in *People v. Gilmore*, 63 Ill. 2d 23, 29, 344 N.E.2d 456, 459 (1976) (when an indictment is attacked for the first time on appeal, it is sufficient if it "apprised the accused of the precise offense charged with sufficient specificity to prepare his defense and allow pleading a resulting conviction as a bar to future prosecutions arising out of the same conduct"), or *People v. Thingvold*, 145 Ill. 2d 441, 448, 584 N.E.2d 89, 91 (1991) (when an instrument is challenged before trial in a motion to dismiss, the rule requiring that a defendant show prejudice does not apply). The court held that, "under the unique circumstances of this case," defendant was not required to show prejudice to warrant reversal of his convictions but rather the instrument must strictly comply with section 111—3. *Benitez*, 169 Ill. 2d at 259, 661 N.E.2d at 351. The "unique circumstances" the court referenced were: (1) the State's egregious conduct in amending the indictment without adhering to

the rules of criminal procedure; (2) counsel's objection to the indictment on the second day of trial due to the fact that he was unaware, until that date, of the original indictment; (3) the untimely discovery of the original indictment that precluded a pretrial motion to dismiss the indictment; (4) counsel's agreement to allow the trial to continue with the understanding that the issue of the indictment was not waived; and (5) the fact that the issue of the sufficiency of the indictment was raised again in defendant's posttrial motion. *Benitez*, 169 Ill. 2d at 259, 661 N.E.2d at 351.

Subsequently, in *People v. Scott*, 285 Ill. App. 3d 95, 673 N.E.2d 1152 (1996), the Second District of this court had before it a challenge to the sufficiency of an indictment that was first raised following the close of the State's case in chief. Relying on the supreme court's holding in *Benitez*, the court ruled that when the sufficiency of the complaint is attacked in the trial court either before or during trial, a court determines whether the instrument strictly complies with section 111—3(a) of the Code. *Scott*, 285 Ill. App. 3d at 99, 673 N.E.2d at 1154.

Defendant urges us to follow the holdings in *Benitez* and *Scott* to determine whether the indictment in question here strictly complies with the requirements of section 111—3. We decline to do so. We do not interpret the holding in *Benitez* to stand for the proposition that every defendant who initially raises a challenge to the sufficiency of the indictment at trial may have his convictions reversed without establishing prejudice. Looking at the language in *Benitez*, the court clearly limited its holding to the "unique" facts of the case and left sufficient room in which to distinguish other cases, like the one before us, in which a defendant raises an objection to a charging instrument for the first time at trial after the State has presented it's case.

■ In *Benitez*, defense counsel did not have an opportunity to object to the charging instrument in a pretrial motion because he was not aware of the original indictment until after trial had commenced. Here, unlike *Benitez*, there was one indictment and it was obtained in accordance with the rules of criminal procedure. Counsel was provided with a copy and had ample opportunity to read it. In addition, counsel was not precluded from objecting to the indictment in a pretrial motion. We therefore find that defendant is not entitled to a reversal of her conviction without demonstrating how the alleged defect in the indictment prejudiced her in preparing her defense.

■ Accordingly, we now consider whether the trial court erred in denying defendant's motion to dismiss because the charging instrument failed to set forth, with sufficiency, the nature and elements of the criminal charges against her thereby impeding her ability to prepare her defense.

The State contends that the indictment sufficiently alleged the offense of solicitation of murder for hire as the term "solicit" and the term "procure" are synonymous. Defendant argues that the terms "solicit" and "procure" cannot be used interchangeably, as they were here, because the legislature clearly intended that the terms have separate meanings.

Section 2—20 of the Criminal Code of 1961 defines the term "solicit" as "to command, authorize, urge, incite, request, or advise another to commit an offense." 720 ILCS 5/2—20 (West 2000). Although the Code does not define "procure," section 8—1.1 of the Criminal Code of 1961, which defines the offense of solicitation of murder, does not use the word "procure." Instead, this section clearly uses "solicit." Section 8—1.1 states: "(a) A person commits solicitation of murder when, with the intent that the offense of first degree murder be committed, he commands, encourages or requests another to commit that offense." 720 ILCS 5/8—1.1 (West 2000). The legislature's failure to use the word "procure" in this section, defendant maintains, indicates that the legislature intended "procure" to mean something other than "command, encourage or request."

The common meaning of the word "procure" is:

"1 a (1): to get possession of : OBTAIN, ACQUIRE *** (2) : GAIN, WIN *** 2 a (1): to cause to happen or be done: bring about: EFFECT *** ACHIEVE ***: to bring about by particular care or effort *** and sometimes by devious means *** (2): to bring about by scheming and plotting: CONTRIVE *** 3 a: to prevail upon to do something indicated: INDUCE ***." Webster's Third New International Dictionary 1809 (1986).

We agree with the State that the terms "solicit" and "procure" can be synonymous. Roget's Interactive Thesaurus (v 1.0.0). However, we are guided by the well-established principle that when a statute is unambiguous, we must enforce it as enacted and may not depart from the language by creating exceptions, limitations or conditions not expressed by the legislature. *People v. Woodard*, 175 Ill. 2d 435, 443, 677 N.E.2d 935, 939 (1997).

As previously stated, when considering the sufficiency of the indictment, we must look to whether the indictment alleges sufficient particularity to ensure that the defendant may prepare a proper defense. We find that defendant was not inhibited in preparing her defense by the substitution of the word "solicit" in the indictment.

Our review of the record in the case *sub judice* reveals that prior to filing a motion to dismiss the indictment, defense counsel filed and argued a motion for a directed finding alleging that the State failed to prove, in its case in chief, that defendant "procured" Jiminez to kill her husband. Specifically, defense counsel argued:

"They [the legislature] chose different language, that language being to procure. *** I could bring you some cases tomorrow morning which would show that 'procure' means to obtain. You have to obtain a person to agree to do it. And it's very clear that Jiminez always said he never agreed to do it, and that's why the instructions for these two offenses they have different language.

The fact the indictment may have had inappropriate language doesn't control. What controls is the statute. And if there is any doubt concerning what 'procurement' means, I ask I be able to bring in cases for that tomorrow."

Based on counsel's argument above, it is clear to us that defendant was not inhibited in preparing her defense by the use of the word "solicit" in the indictment. There is no doubt that defendant was apprised of the charge and that defendant was aware of what the State needed to prove to sustain a conviction for solicitation of murder for hire. Consequently, we find that defendant's conviction for solicitation of murder for hire is not subject to reversal as defendant suffered no prejudice as a result of the State's substitution of the word "solicit" for the word "procure."

## II. Insufficient Evidence to Convict

Next, defendant argues that even if we accept as true the testimony of the prosecution witnesses, the evidence is insufficient as a matter of law to prove that defendant committed the offense of solicitation of murder for hire. Defendant maintains that because Benjamin Jiminez agreed only to find someone to kill defendant's husband, defendant did not "procure" another to commit the offense of first degree murder as required by section 8—1.2. 720 ILCS 5/8—1.2 (West 2000).

■ It is not the function of this court to retry the defendant. *People v. Sanchez*, 115 Ill. 2d 238, 260-61, 503 N.E.2d 277, 284 (1986). Rather, it is our duty to review the evidence to determine whether it is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt. *People v. Manion*, 67 Ill. 2d 564, 578, 367 N.E.2d 1313, 1319 (1977). The relevant inquiry is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Smith*, 185 Ill. 2d 532, 541, 708 N.E.2d 365, 369 (1999).

The State argues that the premise of defendant's argument is incorrect because it presumes that someone need actually be found to commit murder before the offense of solicitation of murder for hire can have been committed. In support of its position, the State relies on *People v. Breton*, 237 Ill. App. 3d 355, 603 N.E.2d 1290 (1992).

In *Breton*, a jail inmate informed the State's Attorney's office that defendant was looking for someone to kill Wehrmeister, who was scheduled to testify against him. The State's Attorney's office devised a plan to allow defendant to contact an undercover investigator posing as a hitman. The inmate was given an untraceable undercover phone number to give to defendant. *Breton*, 237 Ill. App. 3d at 357, 603 N.E.2d at 1292.

Defendant called this number several times and spoke with Investigator Dan Callahan, who was posing as a hitman. Defendant offered Callahan $5,000 in exchange for killing Wehrmeister. Intricate plans were laid by defendant to allow Callahan to retrieve the "up-front" $2,500. Defendant called again several days later and inquired about the "job." He was told that Wehrmeister was taken care of. Defendant offered that the remainder of the money would be available the next day. Defendant was subsequently charged and convicted of solicitation of murder for hire. *Breton*, 237 Ill. App. 3d at 357-58, 603 N.E.2d at 1293.

On appeal, defendant's main contention was that the State failed to prove the "agreement" element of its solicitation of murder for hire. The crux of defendant's argument was that Investigator Callahan's feigned agreement did not satisfy the "agreement" element of solicitation of murder for hire. Defendant attempted to analogize the issue to a similar conspiracy law in Illinois that requires an agreement based on the bilateral theory of conspiracy. Under the bilateral theory of conspiracy, a supposed agreement between a defendant and a government agent only feigning agreement will not support a conspiracy conviction because there is no agreement and actual agreement is necessary. *Breton*, 237 Ill. App. 3d at 360, 603 N.E.2d at 1294.

The *Breton* court compared the *actus reus* of conspiracy (an agreement to commit a crime) with the *actus reus* of solicitation (an attempt to persuade another to commit a crime) and determined that because of the nature of solicitation, the solicitation statute is based on the unilateral theory, which only requires actual agreement by one of the parties. *Breton*, 237 Ill. App. 3d at 361, 603 N.E.2d at 1295, citing I. Robbins, *Double Inchoate Crimes*, 26 Harv. J. on Legis. 1, 29-30 (1989). The court ultimately held "[p]rocurement of another to commit murder pursuant to an agreement where a defendant agrees with a government agent feigning agreement is sufficient to support a conviction of solicitation of murder for hire." *Breton*, 237 Ill. App. 3d at 362, 603 N.E.2d at 1295-96.

■ Here, defendant told Benjamin that she wanted her husband killed and offered to pay him $10,000. Benjamin told her once that he would not do it himself but told her numerous times that he would

look into it. Defendant inquired several times into whether Benjamin had found someone to kill her husband. Similar to the investigator "hitman" in *Breton*, Benjamin's intent is irrelevant. Whether he intended to do the killing himself or find someone else to do it is not the issue here. The issue is whether defendant, with the intent that first degree murder be committed, procured someone pursuant to a contract or agreement for money. We find that, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found that defendant procured Benjamin to commit first degree murder pursuant to an agreement for money.

## III. Right to Confrontation

Defendant next argues that she was denied her right to confront Benjamin Jiminez because she could only see his profile. Benjamin, a paraplegic, is confined to a wheelchair and was unable to ascend to the witness stand. The trial court suggested that Benjamin testify from "in front of the bench" and counsel agreed. Defendant now faults the trial court for failing to arrive at a more innovative alternative that would have allowed defendant to effectively exercise her right to face-to-face confrontation.

Although defense counsel initially agreed that Benjamin could testify from in front of the bench, counsel subsequently objected to this arrangement after he was informed that Benjamin would be facing the jury. Defense counsel argued that if Benjamin was facing the jury, he and defendant would not be able to see Benjamin's face. The trial court replied:

"He will be right in the well of the courtroom. You can see him. *** Certainly better than if he was up in the witness box where my bench cuts him off.

* * *

He is 10 feet from you and—maybe not 10 feet. Maybe 8 to 9 feet from you and Miss Cuadrado. I cannot see how you cannot possibly see his face.

If you're saying you're entitled to see his face from one side of his face to the other, then you may move your seat. You can see the entire right side of his face and if he turns his head slightly as he just did, you can see the front of his face. If you want to move, you can move.

* * *

If defense counsel is asking me to have the witness face away from the jury toward the defense counsel, I am not going to do that.

If you'd like to move you certainly can move. You can see 75 percent of his face from where he is seated. And if he turns slightly you can see his whole face."

■ The confrontation clause of the sixth amendment provides, "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him" (U.S. Const., amend. VI). This right is applicable to the states through the fourteenth amendment. *Maryland v. Craig*, 497 U.S. 836, 844, 111 L. Ed. 2d 666, 677, 110 S. Ct. 3157, 3162 (1990). In 1994, the Illinois Constitution was amended to remove the "face-to-face" language of article I, section 8, and conform Illinois's confrontation clause with the sixth amendment of the United States Constitution. Ill. Const. 1970, art. I, § 8 (amended November 8, 1994). *People v. Lofton*, 194 Ill. 2d 40, 53, 740 N.E.2d 782, 790 (2000).

Defendant attempts to persuade us to find an infringement of her right to face-to-face confrontation by analogizing the facts of the case at bar with cases such as *Coy v. Iowa*, 487 U.S. 1012, 101 L. Ed. 2d 857, 108 S. Ct. 2798 (1988) (where Court held that placing a screen between a defendant and child sexual assault victims during their testimony at trial violated defendant's right to face-to-face confrontation), and *People v. Lofton*, 194 Ill. 2d 40, 740 N.E.2d 782 (2000) (use of podiums that prevented the child witness and the defendant from seeing one another as the witness testified violated defendant's right to confrontation). We are not persuaded.

■ This is not a case where defendant was prevented from seeing the witness testifying against her (see *Smith v. State*, 111 Nev. 499, 894 P.2d 974 (1995)), nor was the witness intentionally shielded or hidden from defendant's view in an effort to spare the witness unbearable emotional distress as in *Coy* and *Lofton*. Rather, it is a case where the witness, because of his medical condition, was placed in a position within the courtroom simply because "there [was] no other place to put him." Evidence of the court's intention not to deprive defendant or defense counsel of the opportunity to see the witness's full face is found in the record where the court tells defense counsel that if he is dissatisfied with his view of Benjamin's face, he can move to a position of his liking.

The Supreme Court has recognized that " 'the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial.' [Citation.]" (Emphasis in original.) *Craig*, 497 U.S. at 849, 111 L. Ed. 2d at 681, 110 S. Ct. at 3165. Accordingly, the confrontation clause has been interpreted in a "manner sensitive to its purposes and sensitive to the necessities of trial and to the adversary process." *Lofton*, 194 Ill. 2d at 57, 740 N.E.2d at 792, citing *Craig*, 497 U.S. at 849, 111 L. Ed. 2d at 681, 110 S. Ct. at 3165. The needs of the witness in this case required that special accommodations be made. We find that, given the circumstances, these accommodations were reasonable and defendant's right to confrontation was not violated.

Based on the foregoing, we affirm the judgment of the trial court.

Affirmed.

HARTMAN and GREIMAN, JJ., concur.