**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230283-U

Order filed October 17, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0283 Circuit No. 10-CF-2112 |
| CHRISTIAN L. SHEPHERD, | ) ) ) | Honorable David M. Carlson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE PETERSON delivered the judgment of the court.
Justices Brennan and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  (1) The evidence was sufficient to sustain defendant's convictions for solicitation of murder for hire, and (2) the jury instructions properly conveyed the allegations contained within the indictment.

¶ 2     Defendant, Christian L. Shepherd, appeals from his convictions for solicitation of murder for hire. Defendant contends the evidence was insufficient to prove each offense beyond a reasonable doubt. Further, defendant contends that the jury instructions failed to properly convey the allegations of the indictment to the jury. We affirm.

¶ 3                                 I. BACKGROUND

¶ 4        On October 28, 2010, defendant was indicted on two counts of solicitation of murder for hire (720 ILCS 5/8-1.2(a) (West 2010)) and five counts of solicitation of murder (*id.* § 8-1(b)). Relevant to this appeal, the first count of solicitation of murder for hire alleged that, on or between June 1 and August 21, 2010, defendant procured Daniel Robinson to commit first degree murder "pursuant to an agreement or understanding, whereby *** Robinson would kill A.V., Regina Vince and Franklin Bryant, and the defendant would pay *** Robinson a sum of money." The second count of solicitation of murder for hire alleged the same conduct but named Renee Maly and Jason Opiola as the intended victims. The case proceeded to a jury trial on November 1, 2022. The court read the charging document for the potential jurors during *voir dire*.

¶ 5        At trial, Maly, a detective with the Crest Hill Police Department, testified that in April 2010, she and Detective Opiola were investigating a complaint of criminal sexual abuse made by A.V. and his mother, Vince, against defendant. Defendant was ultimately arrested and booked into the Will County jail on May 1, 2010. Defendant's cellmate, Bryant, contacted Maly on May 11, 2010, stating that he wished to speak with her "about a very important case that was vital to [her] and other people involved." Maly met with Bryant the next day. Bryant informed her that defendant had approached him about having him kill Maly, Opiola, A.V., and Vince. Defendant provided Bryant with written information about the intended victims, including a diagram of the Vince house, descriptions of A.V. and Vince, a letter to be given to Vince, and descriptions of Maly and Opiola detailing "[their] work hours, where [they] work, and the vehicle that [they] drive for work." Bryant gave the documents to Maly.

¶ 6        Bryant testified that in early May 2010 he was being held at the Will County jail. He shared a cell with defendant. During that time, Bryant learned that defendant was in custody on "some

2

sort of a sex case." Bryant testified that defendant told him that he would pay him to kill Vince, A.V., Maly, and Opiola. Defendant specified how he wanted them to be killed and offered $6000 to complete the job. Bryant did not believe defendant at first. He thought defendant may be playing some "type of trick on [him]." Defendant then signed over his commissary to pay Bryant and provided him with information about the intended victims. Once Bryant realized that defendant was serious, he requested to speak with Maly. After his meeting with police, Bryant cooperated with an investigation of defendant, taking partial payments. Defendant was ultimately charged with solicitation of murder for hire. Bryant was offered a reduction of his charge for his cooperation in the matter but he "kept breaking the law" so the deal was rescinded.

¶ 7          Robinson testified that in June 2010 he was being held in the Will County jail. At that time, defendant approached Robinson and claimed that he had recently attempted to hire someone "to kill the victim in his case and *** did [Robinson] know anybody that would *** take care of that." Robinson stated that defendant named Bryant, Opiola, Maly, A.V., and Vince as the individuals that he wanted "taken care of." Initially, Robinson thought that defendant was joking. However, as their conversations progressed, defendant became "more specific that he wanted them dead." Defendant disclosed to Robinson that Bryant had "ran off with his money." Eventually, Robinson reached out to officers informing them that defendant offered to compensate him to facilitate the murder of the individuals involved in his other cases.

¶ 8          Two days later, on June 14, Robinson spoke with Detectives Anthony Policandriotes and Steven Talmontas. Robinson identified defendant in a June 14, 2010, photographic lineup and in open court as the individual he had been speaking with in jail. Robinson told the detectives that defendant offered $6000 to Bryant to kill A.V., Vince, Maly, and Opiola. Defendant paid Bryant $900 before "catching a charge." Robinson also provided detectives with a map and other

3

information that defendant had given him to help facilitate the murders. Robinson drafted a fake letter to his "outside fake hit man" to make defendant believe that he was going along with their plans. Robinson agreed to wear a recording device to capture his conversations with defendant in jail. Recordings were made of Robinson's conversations with defendant on June 22, 28, and 30, 2010. Robinson testified the June 22 recording occurred in the jail yard with approximately 20 to 25 other inmates present which made the conversations difficult to hear. At times, Robinson can be heard speaking but defendant either does not respond or responded too quietly to be captured on the recording over the background noise. The other two days of recorded conversations occurred in Robinson's cell with other inmates walking around. The recordings were admitted, and portions were published for the jury.

¶ 9 The June 22 recording depicted Robinson asking defendant about cameras surrounding the Vince residence, urging defendant to talk to him, and asking for $2000 to kill A.V. When asking about Bryant, Robinson can be heard saying, "You said you'd pay me more money to take care of that." Robinson and defendant discussed the price for killing both A.V. and Vince. Robinson asked defendant to confirm that the price would be $4000. Defendant's response was mumbled. Defendant discussed which entrance the hitman would use to enter the Vince residence to kill A.V. and Vince, and agreed that the front door would be a poor option due to a camera. Defendant told Robinson that he was unsure when he would be able to provide payment, indicating that he would put the money into Robinson's account if he provided the information.

¶ 10 Approximately one hour later, defendant confirmed for Robinson that he had not informed anyone of their plans and that he was serious and wanted Robinson to proceed. When asked if he wanted to leave a message for Bryant before they "take care of him," defendant indicated that he wanted Bryant to know that this was the result of taking defendant's money and informing the

4

police about him. Defendant later mentioned "the cop that he was going to whack," and Crest Hill Police. They continued to discuss the logistics of payment and potential credit cards or cash advances as compensation.

¶ 11 On June 28, the recording reflects that Robinson informed defendant that the hitman had killed Bryant first. Defendant confirmed that, while Bryant was not the intended first victim, he wanted him dealt with. Defendant and Robinson then discussed payment again. Defendant informed Robinson that he would have the credit card information on Friday. Robinson confirmed with defendant that A.V. would be the next victim. Robinson stated that he needed to be paid and indicated that he would like $4000 from the credit card and $12,000 from another credit card. Defendant agreed. They agreed that payment was to be made after defendant received confirmation about Bryant. They continued to discuss their plans. When Robinson asked defendant about killing the officers, defendant responded, "It's not even worth doing the cops." Robinson stated, "I thought you did before" to which defendant replied, "That's before." Robinson told defendant to think about it and that it was for him to decide.

¶ 12 On the June 30 recording, defendant told Robinson that detectives had spoken with him about how Bryant went missing. Defendant indicated that he believed Robinson, and his mother should be coming on Friday with the credit card information. Defendant told Robinson that he would be getting $4000 later that week and they discussed an additional $12,000. Robinson told defendant that Bryant was "on the house" to demonstrate to defendant how serious he was. Robinson and defendant continued to discuss payment, the plan regarding A.V. and Vince, and about there being "three missing people."

¶ 13 Robinson indicated that defendant eventually paid him. Defendant executed two documents authorizing Robinson to use approximately $18,000 from two credit cards. Defendant

5

also signed over ownership of his Ford Taurus to Robinson. Robinson "arranged somebody fake to meet up with his family member to pick up the vehicle" but never intended to obtain the vehicle. Robinson testified that a problem occurred with the credit card payments, and he informed defendant that nothing else would transpire until the payment issue was resolved. When defendant approached Robinson afterwards, expressing a renewed interest in having Maly and Opiola killed, Robinson stated that he would not be killing anyone else due to not receiving enough payment for what was previously owed to him. Robinson overheard defendant attempting to obtain Opiola's address from a family member. Robinson reiterated that he never intended to kill or hire someone to kill anyone. In exchange for his cooperation, Robinson received concurrent sentences on his pending cases.

¶ 14       The parties stipulated that Will County jail records would show that on three separate occasions in July and August 2010, $300 was deposited from an outside account to Robinson's inmate account. Additionally, on August 27, 2010, from an external account, defendant deposited $300 into Robinson's inmate account.

¶ 15       James Gleason testified that he knew defendant because of a prior dating relationship that he had with defendant's mother. In August 2010, defendant called Gleason from the Will County jail. The recorded phone calls were published to the jury. In the calls, defendant requested bank information and asked Gleason to discover the addresses of Maly, Opiola, and a third individual. Gleason testified that detectives came to his home in early September to ask if defendant had provided him with any names or numbers. Gleason confirmed that defendant had and that Gleason did not give any information to defendant.

¶ 16       Detective Wayne Ratajack of the Will County Sheriff's Department testified that he spoke with defendant on June 30, 2010. He informed defendant that Bryant had gone missing under

suspicious circumstances and asked if defendant knew his whereabouts. Ratajack stated that his purpose was to lead defendant to believe that Bryant had been killed and lend credibility to Robinson.

¶ 17    Detective Policandriotes testified that, initially, he investigated a potential murder for hire scheme that involved defendant soliciting Bryant to commit murder. Upon completing his investigation, defendant was charged with solicitation of murder for hire, and Policandriotes informed defendant that Bryant had informed the police about the scheme. Shortly thereafter, Policandriotes learned that defendant was attempting to solicit Robinson to murder several individuals.

¶ 18    Policandriotes interviewed Robinson on June 14, 2010. Robinson informed Policandriotes that defendant had approached him and asked if he would be willing to kill A.V., Vince, Bryant, Maly, and Opiola for money. Robinson provided Policandriotes with documents including Bryant's name and address, handwritten notes, and a map of Vince's residence that defendant had drawn. Policandriotes obtained judicial permission to record Robinson's conversations with defendant on June 22, 28, and 30, 2010. Prior to June 30, Robinson had created and provided fictitious letters to and from a hitman to cause defendant to believe that Robinson was serious, and Bryant had been killed. Policandriotes indicated that he, Ratajack, and Talmontas interviewed defendant about Bryant's whereabouts to lead him to believe his plans were proceeding.

¶ 19    Robinson gave Policandriotes the credit card documents that defendant provided him. Policandriotes learned that defendant had reached out to Gleason asking for Maly and Opiola's addresses. He listened to the recorded phone calls and spoke with Gleason who gave him notes from the conversation that he had with defendant.

¶ 20    During closing arguments, the State informed the jury that:

7

"The first two counts are counts of solicitation of murder for hire. ***

*** The first count charges that offense against [A.V.], *** Vince, and

*** Bryant, that the defendant attempted to procure *** Robinson to commit first

degree murder against these people pursuant to an agreement for money or

something of value."

Later, the State reiterated that the first count "is the solicitation for murder for hire of [A.V.], *** Vince, and *** Bryant."

¶ 21       The jury instruction verdict form for the first count of solicitation of murder for hire, which was read verbatim to the jurors, listed the alleged victims as "[A.V.], *** Vince, *** Bryant" without using any conjunctions. The jury found defendant guilty on all counts. Defendant filed a posttrial motion which challenged the sufficiency of the evidence but did not address any issue with the jury instructions. The five solicitation of murder charges merged into the two solicitation of murder for hire convictions for the purposes of sentencing. Defendant was sentenced to 39 years' imprisonment on the first count of solicitation of murder for hire and a consecutive term of 37 years' imprisonment on the second count. Defendant appealed.

¶ 22                                    II. ANALYSIS

¶ 23       On appeal, defendant argues that the State failed to prove each offense of solicitation of murder for hire beyond a reasonable doubt. Specifically, defendant argues that (1) the evidence was insufficient to show that any kind of agreement was reached for Robinson to kill Bryant, Maly, and Opiola for a sum of money, and (2) he never "procured" Robinson to murder the alleged victims under the term's plain meaning. Further, defendant argues that his conviction for solicitation of murder for hire regarding A.V., Vince, and Bryant must be reversed where the

8

provided jury instructions for that offense failed to properly convey the allegations of the indictment to the jury.

¶ 24                                    A. Sufficiency of the Evidence

¶ 25          To sustain defendant's convictions for solicitation of murder for hire, the State must prove, beyond a reasonable doubt, that defendant "with the intent that the offense of first degree murder be committed, *** procure[d] another to commit that offense pursuant to any contract, agreement, understanding, command, or request for money or anything of value." 720 ILCS 5/8-1.2(a) (West 2010).

¶ 26          In a challenge to the sufficiency of the evidence, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). It is not the function of the reviewing court to retry defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). In reviewing the evidence presented, we must "allow all reasonable inferences from that evidence to be drawn in favor of the [State]." *People v. Martin*, 2011 IL 109102, ¶ 15. "A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 27          First, defendant contends that the State's evidence failed to show that any kind of agreement or understanding was reached to have Robinson kill Bryant, Maly, and Opiola for a sum of money. In support of this, defendant highlights that the audio recordings of his conversations with Robinson do not discuss any particular amount of money for killing Bryant and focus on the sum of $4000 for killing A.V. and Vince. Further, Robinson made a comment to

9

defendant on June 30, which stated that Bryant's killing had been "on the house," indicating that Bryant was not, in fact, killed for a sum of money.

¶ 28    Regarding Maly and Opiola, defendant argues that no agreement or understanding, feigned or otherwise, was reached between defendant and Robinson. Defendant cites portions of the audio recorded conversations in support of this contention. Specifically, on June 28, Robinson and defendant discussed whether to proceed with killing the officers. Defendant told Robinson, "It's not even worth doing the cops." Robinson replied that he thought defendant had wanted the officers killed to which defendant responded, "That's before." Robinson told defendant that the choice was his and to think about it. On the June 30 recording, Robinson again urged defendant to think about whether he wanted the officers killed since he had previously. Defendant argues that these conversations, coupled with Robinson's failure to mention Maly and Opiola when talking about their plans and asking defendant to envision "three missing people" demonstrates that there was no agreement in place for the murder of Maly and Opiola.

¶ 29    Here, the trial evidence shows that defendant and Robinson began discussing plans to kill A.V., Vince, Bryant, Maly, and Opiola in the weeks prior to Robinson recording his conversations with defendant. Robinson testified that defendant had approached him about killing all five individuals. Robinson informed detectives that defendant offered compensation for the killings. Though the audio recordings focused heavily on A.V. and Vince, in the initial June 22 recording, defendant and Robinson also discussed leaving a message for Bryant before they "take care of him" and defendant mentioned the officer that he was going to "whack," and Crest Hill Police. Further, defendant and Robinson discussed a sum of $4000 for killing A.V. and Vince, an unspecified amount for killing Bryant, and $12,000 from another credit card.

10

¶ 30     Based on this evidence, we conclude that a rational trier of fact could have found that defendant and Robinson had reached an agreement or understanding to kill Bryant, Maly, and Opiola in exchange for money. The initial agreement that they reached for Robinson to kill Bryant for more than the $4000 being offered for the killing of A.V. and Vince is sufficient because the State was not required to prove a specific dollar amount. See 720 ILCS 5/8-1.2(a) (West 2010); *People v. Patel*, 366 Ill. App. 3d 255, 271-72 (2006). Additionally, Robinson's eventual offer to forgo receiving money for Bryant's killing does not alter the fact that the agreement to provide monetary compensation was made. See *Patel*, 366 Ill. App. 3d at 271 ("[T]he terms of the statute do not require that money change hands or that the solicitor actually use 'specific words' in order to be found guilty of solicitation of murder for hire."). Further, defendant reversing his decision to include Maly and Opiola in their agreement, does not establish that no agreement ever existed. See *People v. Harvey*, 95 Ill. App. 3d 992, 1003 (1981) ("Once the evidence establishes that the essential elements of the offense have occurred, it follows that there can be no withdrawal from a completed offense.").

¶ 31     Having determined that the evidence was sufficient to establish that an agreement existed between defendant and Robinson regarding all five named individuals, we turn to defendant's remaining statutory argument. Defendant argues that the State failed to prove the element of procurement. No definition for the term "procures" is provided in the Criminal Code of 2012. Where the statute does not provide a definition, reviewing courts have given these terms their common dictionary definition. *People v. Miki*, 2020 IL App (2d) 190862, ¶ 55. In relevant part, procure commonly means: "to obtain (something) by particular care and effort." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/procure (last visited Sept. 11, 2024).

11

¶ 32    Defendant contends that a bilateral agreement is necessary for the State to prove procurement and that because Robinson feigned agreement and testified that he never intended to murder or find someone to murder A.V., Vince, Bryant, Maly, and Opiola, defendant did not procure Robinson to commit the offense. We disagree.

¶ 33    Illinois case law has established that the solicitation of murder for hire statute is based on a unilateral theory, "which only requires actual agreement by one of the parties." *People v. Breton*, 237 Ill. App. 3d 355, 362 (1992). "Procurement of another to commit murder pursuant to an agreement where a defendant agrees with a government agent feigning agreement is sufficient to support a conviction of solicitation of murder for hire." *Id.*

¶ 34    Defendant acknowledges this precedent and urges us to depart from it, arguing that the logic employed in *Breton* effectively substitutes the term "solicits" for the term "procures" and ignores Illinois Supreme Court precedent. In support of this argument, defendant relies on *People v. Cuadrado*, 214 Ill. 2d 79, 88 (2005). However, in that case the Supreme Court addressed whether the indictment was sufficient, not the sufficiency of the evidence at trial. *Id.* at 83-88. The defendant in *Cuadrado* had attacked the sufficiency of the evidence on appeal to the First District, arguing that she had not procured another to murder her husband where the individual said he would look for someone to perform the act then subsequently planned to blackmail the defendant. *People v. Cuadrado*, 341 Ill. App. 3d 703, 714 (2003). When finding the evidence sufficient to convict, the First District, citing *Breton*, agreed that the intent of the individual procured by defendant is irrelevant. *Id.* at 715-16. This issue was not argued to or considered by the Illinois Supreme Court.

12

¶ 35        Additionally, the holding in *Breton* does reflect the precedent set by *People v. Foster*, 99 Ill. 2d 48, 53 (1983). When deciding that a conspiracy charge required bilateral agreement, the Illinois Supreme Court emphasized that

> "Illinois does have a solicitation statute which embraces virtually every situation in which one could be convicted of conspiracy under the unilateral theory. *** There would appear to have been little need for the legislature to adopt the unilateral theory of conspiracy in light of the existence of the solicitation statute." *Id.*

Accordingly, *Breton* and subsequent appellate case law over the last 32 years have correctly held that solicitation of murder for hire requires only a unilateral agreement and we will not depart from this well-established precedent.

¶ 36                                    B. Jury Instructions

¶ 37        Defendant next argues that the instructions provided to the jurors did not properly convey the allegations of the indictment where they omitted a necessary conjunction between the listed victims. Defendant acknowledges that he did not preserve this issue but argues that relief is warranted under the plain error doctrine.

¶ 38        The plain error doctrine permits a reviewing court to remedy a "clear or obvious error" when: (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant contends that his claims of error are reversible under either prong of the plain error analysis. The first step of the plain error analysis is to determine whether an error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

13

¶ 39        "The function of jury instructions is to convey to the jury the law that applies to the evidence presented." *People v. Herron*, 215 Ill. 2d 167, 187 (2005). "[J]ury instructions should not be misleading or confusing." *People v. Bush*, 157 Ill. 2d 248, 254 (1993). Their correctness depends on "whether ordinary persons acting as jurors would fail to understand them." *Herron*, 215 Ill. 2d at 188. "Where jury instructions are unclear or ambiguous, a reviewing court can look to the opening statements and closing arguments for clarification." *People v. Valadovinos*, 2014 IL App (1st) 130076, ¶ 23.

¶ 40        Here, the indictment for the first count of solicitation of murder for hire alleged that defendant procured "Robinson [to] kill A.V., *** Vince *and* *** Bryant." (Emphasis added.) The instructions provided to the jurors both orally and in writing listed the three names without any conjunction: "[A.V.], *** Vince, *** Bryant." Defendant argues that this omission made the instruction ambiguous, confusing, and misleading, leaving ordinary jurors unable to know whether they needed to find that the agreement was for A.V., Vince, *and* Bryant or that the agreement was for either A.V., Vince, *or* Bryant.

¶ 41        During *voir dire*, the court read the charging document to the jurors. The court clearly informed the jurors that defendant was being charged for solicitation of murder for hire against "A.V., *** Vince, *and* *** Bryant." (Emphasis added.) Further, just prior to being read the instructions, during closing arguments, the State listed the victims for the first solicitation of murder for hire charge twice, both times explaining to the jury that the charge involved all three people, "[A.V.], *** Vince, *and* *** Bryant." (Emphasis added.) The verdict forms clearly listed the two groups of people involved in each respective charge, enabling the jurors to know which form referred to which charge. The instruction did not include any incorrect or misleading conjunctions. The omission of the word "and" would not cause any undue confusion or inability

14

to be understood where the jurors were repeatedly told that the charge required a finding that the solicitation of murder for hire had been committed against all three named people. Accordingly, we conclude that no instructional error occurred under these circumstances.

¶ 42                                    III. CONCLUSION

¶ 43          The judgment of the circuit court of Will County is affirmed.

¶ 44          Affirmed.