2025 IL App (1st) 220116

Fifth Division
September 26, 2025

1-22-0116

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15CR2534 |
| | ) | |
| | ) | |
| JIMMIE SMITH, | ) | Honorable |
| | ) | Brian Telander, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE TAILOR delivered the judgment of the court, with opinion.
Presiding Justice C.A. Walker and Justice Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1     Jimmie Smith was charged with multiple counts of solicitation of murder and solicitation

of murder for hire based on his efforts, while detained at the Cook County Jail awaiting trial on

other charges, to arrange for the murders of Judge James Linn and Assistant State's Attorney

(ASA) Michelle Papa, the judge and prosecutor in his case. Specifically, the charges for solicitation of murder alleged that Smith "requested, commanded, or encouraged" undercover officer Andrew Gutter to kill Judge Linn and ASA Papa and that he "requested, commanded, or encouraged" fellow detainee Quinton Davis to kill ASA Papa. The charges for solicitation of murder for hire alleged that Smith "procured" Gutter to kill Judge Linn and ASA Papa, pursuant to "contract, agreement, understanding, command[,] or request for money or anything of value."

¶ 2                                      I. BACKGROUND

¶ 3      Prior to trial, the State moved *in limine* to impeach Smith, if he testified, with certified copies of his convictions for aggravated kidnapping, aggravated criminal sexual assault, and unlawful restraint—the charges on which Smith was awaiting trial when he committed the offenses of solicitation that are the subject of the instant appeal. Smith did not object but argued that the jury should not be told the nature of the offenses because the "overly prejudicial" effect would "far outweigh[ ] any probative value." The court granted the State's motion and ruled that the State would be permitted to name the convictions because "the nature of [an] offense is relevant when a jury *** judges credibility." The State explained that, in its case-in-chief, it intended to inform the jury only that Smith had been awaiting trial on "a serious felony."

¶ 4      Also prior to trial, Smith moved to suppress two audio recordings that Gutter had made of his conversations with Smith in the jail's visiting room in November and December 2014, arguing that Gutter recorded them in violation of Illinois's eavesdropping statute. Smith argued that before that statute was facially invalidated in March 2014 (see *People v. Clark*, 2014 IL 115776), it prohibited recording any conversation without either the consent of all parties or prior judicial authorization. See 720 ILCS 5/14-1 *et seq.* (West 2014). The conversations had been recorded by Gutter, who wore a hidden recording device, pursuant to an order under section

108A-1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/108A-1 (West 2014)). Under section 108A-4, a judge may authorize law enforcement officers to record a conversation with one party's consent when "there is reasonable cause for believing that an individual is committing, has committed, or is about to commit a felony" and that "conversations concerning that felony offense will be obtained" by the recording. *Id.* § 108A-4. An application for such an order must be authorized by "[t]he State's Attorney or an Assistant State's Attorney authorized by the State's Attorney." *Id.* § 108A-1. And it must, among other things, "state the applicant's authority to make such application" and identify the "law enforcement officer making the application and the State's Attorney authorizing the application." *Id.* § 108A-3(a)(1).

¶ 5    The eavesdropping application in this case was submitted by Officer Kenneth Raher of the Cook County Sheriff's Department and was authorized by ASA Michael Golden, acting "[b]y the authority and consent" of then-State's Attorney Anita Alvarez. In his suppression motion, Smith argued that the application was deficient and the resulting order authorizing the recording thus invalid because it was not signed by State's Attorney Alvarez herself and did not adequately establish that she had authorized ASA Golden to sign it. In response to Smith's motion to suppress, the State proffered that ASA Golden would testify that, as a deputy in the office's special prosecutions bureau, he was authorized under a long-standing policy of the Cook County State's Attorney's office to sign applications for "consensual overhears" under article 108A. The trial court denied Smith's motion to suppress, concluding that the application and recording had been authorized in accordance with section 108A-1 (*id.* § 108A-1).

¶ 6    At Smith's 2019 jury trial, ASA Papa testified that, in 2014, she was the prosecutor in a case against Smith that centered around "a serious felony charge." That case, which had been pending since 2009, was set for trial in mid-December 2014. As that trial date approached, Smith

3

"was becoming more agitated that he did not want to go to trial." ASA Papa had concerns for her safety and the safety of her family as a result of the charges in this case. Based on her experience with Smith, she knew him to be "calculating and dangerous."

¶ 7    Judge Linn testified that he had been a judge for over 30 years, 22 of those years as a criminal court judge. Smith had a case in front of him for a 2009 "serious felony charge." As it got closer to the December 2014 trial date, Smith "became more belligerent, more confrontational, more hostile. He was—he started to become profane." At the final status hearing on November 17, 2014, Smith responded angrily when Judge Linn denied his eleventh-hour request to proceed *pro se* and refused to delay the trial, telling Judge Linn:

> "You think you're God. You're not God. You ain't nobody up there. You're just a white man in a robe that just want to try to tell somebody what to do. F*** you and f*** this courtroom. F*** you think this is. You ain't no mother f*** God. Suck my d***."

Judge Linn felt "uncomfortable" and "concerned" following Smith's outburst because Smith was getting "more combustible, he was getting more aggressive, more hostile."

¶ 8    Quinten Davis testified that he was detained at the Cook County jail with Smith in 2014. One day in the fall of 2014, Smith returned from court "furious mad about whatever [had] happened" and told Davis that he wanted ASA Papa "raped and killed." The following day, Smith asked Davis if he knew anyone who could "let a hit" on ASA Papa. Davis alerted jail officials, who gave him a phone number for an undercover officer who would pose as a hitman named "Big Moe," and told Davis to give the number to Smith if Smith brought up the subject again. When Smith brought it up again, Davis gave Smith the phone number for Big Moe and told Smith that Big Moe was a family friend who would "talk about what *** he wanted done."

¶ 9    Davis testified that when he and Smith had those conversations in the fall of 2014, Davis

was awaiting trial on a charge of first degree murder, which carried a potential life sentence. In exchange for Davis's truthful testimony in Smith's case, the State agreed to a deal in which Davis pleaded guilty to second degree murder and received a 30-year sentence with eligibility for day-for-day good-conduct credit.

¶ 10 On November 5, 2014, Davis called "Big Moe" at Smith's direction and then passed the phone to Smith. Gutter, an investigator with the Cook County Sheriff's Department, answered the phone posing as "Big Moe." Smith told Gutter that he did not "want to do too much talk on the phone" but that Davis had told him that "Big Moe" (Gutter) "could take care of that business about [Smith's] *** court clothes." Smith said that he had someone else working on getting "information about the shop *** [Smith] want[ed] taken care of" and that he would call Gutter again to set up a visit once he had the information. In a subsequent call to Gutter on November 23, 2014, Smith gave Gutter his jail identification number and visiting times and said he would "touch down with" Gutter "on that business" when they met.

¶ 11 Gutter met with Smith in the jail's visiting room on November 30, 2014, and December 7, 2014. Gutter wore a hidden recording device on each occasion. At the first meeting, Smith said that the other person who was assisting him had done the "ground work" and obtained the address and picture of "the car" he and Gutter had "talk[ed] about." Smith and Gutter were the only people in the visiting room on this occasion. At the second meeting, during which more people were present in the visiting room, Smith said he wanted ASA Papa "gone" because she was "doing her job . . . too much" and was "a nuisance." Smith also said that that Judge Linn "need[ed] to go" because he was "act[ing] like [he was] bigger than the . . . law" and thought "he can't get touched." Smith said he wished he could "take [Judge Linn's] whole head off with a dull knife" and suggested that Gutter "tie[ ] [him] up to a chair for a couple days," "do him

dirty," and then burn his body in a steel garbage can. Smith promised to give Gutter a motorcycle worth $5,000 once Judge Linn and ASA Papa were "t[a]ken care of." Smith appeared in court eight days later, on December 15, 2014, and told Judge Linn, "I am pumped up, I couldn't get you, thank you, p***."

¶ 12    Smith was arrested on January 20, 2015. Detective Hector Mendez of the Cook County Sheriff's Department interviewed Smith. After waiving his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), Smith stated that he did not remember having any meetings with Gutter, denied receiving visits from men, and said he had memory problems.

¶ 13    At trial, Smith testified that he did not intend for Gutter to kill Judge Linn and ASA Papa and that he merely pretended to want them murdered to help Davis. He testified that he and Davis had met in jail a couple years earlier and, by 2014, had become "real friends" after realizing that they had grown up in the same neighborhood and that their families knew each other. Smith explained that, at that time, he was awaiting trial on charges of aggravated kidnapping, aggravated criminal sexual assault, and unlawful restraint, which he had since been convicted of. According to Smith, when he complained to Davis about Judge Linn, and Davis in turn expressed concern about the sentence he could receive in his own case, Davis came up with a plan to stage a "fake murder for hire" plot, with goals of helping Davis secure a plea deal by reporting the plot and causing Judge Linn and ASA Papa to recuse themselves from Smith's case. Smith stated that Davis offered to pay him $2,000 for his participation, but that Davis's mother and girlfriend ultimately paid him only $1,400.

¶ 14    Smith testified that, although he knew that Gutter was an undercover officer, he spoke in code during their initial phone call because he wanted to make Gutter believe he was serious and because Davis had not yet paid him. He also did not say much during his initial meeting with

6

Gutter because he was "caught off guard" and was "still working out the details" of his and Davis's plan. According to Smith, he opened up at the second meeting with Gutter because, at that point, Davis had paid him $1,000, and he wanted to "make [Gutter] believe it was a serious plot to kill somebody" so Davis would get the plea agreement.

¶ 15    On cross-examination, Smith admitted that he did not want to go to trial before Judge Linn in December 2014, but claimed that he was only "[s]lightly" angry when he erupted at Judge Linn at the November 2014 status hearing. He also testified that when he said he "couldn't get" Judge Linn at the December 2014 hearing, he did not mean that he was frustrated at having been unable to harm Judge Linn. Smith also stated that he did not tell Detective Mendez during his January 2015 post-arrest interview that the murder-for-hire plot was fake because he did not want to break his deal with Davis.

¶ 16    Smith also called Joseph O'Brien, a jail official, who testified about various transactions on Smith's commissary account. O'Brien said that Smith's account records showed 10 deposits from unknown persons, totaling $1,390, between November 4, 2014, and January 6, 2015.

¶ 17    After both parties rested and delivered closing arguments, the trial court instructed the jury on the elements of the charged offenses, consistent with the relevant statutory language and applicable pattern instructions. During deliberations, the jury requested definitions of "procure" and "pursuant." With the parties' agreement, the court responded: "You have been given the jury instructions and the applicable law, please continue your deliberations." The jury later returned verdicts finding Smith guilty of soliciting Gutter to murder Judge Linn and ASA Papa and soliciting Gutter to murder Judge Linn and ASA Papa for hire and finding him not guilty of soliciting Davis to murder ASA Papa.

¶ 18    In December 2019, the trial court denied Smith's motion for new trial and sentenced him

to concurrent 40-year prison terms on the two solicitation-of-murder-for-hire counts. The two counts of solicitation of murder were merged into the solicitation-of-murder-for-hire counts.

¶ 19    In July 2020, the trial court denied Smith's motion to reconsider his sentences. Smith also filed two *pro se* motions at the same hearing. The first sought a substitution-of-judge for cause, alleging that Judge Telander had engaged in misconduct in the appointment of his counsel and committed other errors. The second motion alleged that trial counsel rendered ineffective assistance by, among other things, failing to subpoena Smith's visitor logs and financial records, as well as recordings of Davis's jail visits and records of his phone calls, all of which Smith claimed would have helped his defense. The trial court continued the matter without ruling on the *pro se* motions. On the next court date, a notice of appeal was filed on Smith's behalf. At a hearing in October 2020, a different circuit court judge considered and denied Smith's motion to substitute judge. Judge Telander then returned to Smith's *pro se* motion, alleging ineffective assistance of counsel; after stating that he had reviewed the motion and had discretion to rule on it without argument, he denied the motion. Smith objected to not being permitted to present argument, and the court allowed him to address the motion, at which time he repeated his claim that counsel failed to subpoena evidence that would have "cleared [him]." The trial court again denied the motion, stating that it was doing so "without argument."

¶ 20    This appeal followed.

¶ 21                                II. ANALYSIS

¶ 22    Smith argues that the State failed to prove him guilty of soliciting a murder for hire beyond a reasonable doubt because the State failed to prove that Smith procured an actual "hitman," where Gutter was an undercover officer who did not intend to kill Judge Linn or ASA Papa. As the State points out, Smith does not dispute that the trial evidence showed that he asked

another person, who he thought was a hitman (despite testifying that he knew "Big Moe" was an uncover police officer), to kill Judge Linn and ASA Papa in exchange for a motorcycle worth $5,000.

¶ 23    In considering a challenge to the sufficiency of the evidence, the relevant inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This court will not retry the defendant. *People v. Nere*, 2018 IL 122566, ¶ 69. The trier of fact's role is to "assess the credibility of the witnesses, weigh the evidence presented, resolve conflicts in the evidence, and draw reasonable inferences from the evidence." *People v. Daniel*, 2022 IL App (1st) 182604, ¶ 102. A reviewing court will not substitute its judgment for that of the trier of fact with respect to those issues. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009).

¶ 24    To sustain a defendant's convictions for solicitation of murder for hire, the State must prove, beyond a reasonable doubt, that defendant "with the intent that the offense of first degree murder be committed, *** procure[d] another to commit that offense pursuant to any contract, agreement, understanding, command, or request for money or anything of value." 720 ILCS 5/8-1.2(a) (West 2014).

¶ 25    Smith argues that in order to "procure" another to commit the offense of solicitation of murder for hire, "the defendant must actually get someone who will commit that offense." Smith contends that because the evidence "showed only that Smith thought he got what he wanted" but did not "get what he wanted" (*i.e.*, "Smith wanted a hit man [but] never got one"), we should reverse his solicitation of murder for hire convictions.

¶ 26    Smith's interpretation of the meaning of "procure" has been consistently rejected by Illinois courts. Illinois case law has established that the solicitation of murder for hire statute is based on a unilateral theory, "which only requires actual agreement by one of the parties." *People v. Breton*, 237 Ill. App. 3d 355, 362 (1992). The solicited person's intent is irrelevant for purposes of establishing a defendant's intent to procure someone to commit the offense of murder. *People v. Cuadrado*, 341 Ill. App. 3d 703, 716 (2003).

¶ 27    In *Breton*, 237 Ill. App. 3d 355, a jail inmate informed the state's attorney's office that the defendant was looking for someone to kill Wehrmeister, who was scheduled to testify against him. The state's attorney's office devised a plan to allow defendant to contact an undercover investigator posing as a hitman. The inmate was given an untraceable undercover phone number to give to defendant. *Id.* at 357. The defendant called this number several times and spoke with Investigator Dan Callahan, who was posing as a hitman. *Id.* at 357-58. Defendant offered Callahan $5,000 in exchange for killing Wehrmeister and came up with an intricate plan to allow Callahan to be paid $2,500 "up front." *Id.* at 358. The defendant called Callahan several days later and inquired about the "job." He was told that Wehrmeister was taken care of. The defendant offered that the remainder of the money would be available the next day. *Id.* at 359. The defendant was subsequently charged and convicted of solicitation of murder for hire. *Id.* at 356-57.

¶ 28    On appeal, the defendant's main contention was that the State failed to prove the "agreement" element of its solicitation of murder for hire. The crux of the defendant's argument was that Callahan's feigned agreement did not satisfy the "agreement" element of solicitation of murder for hire. The defendant attempted to analogize the issue to a similar conspiracy law in Illinois that requires an agreement based on the bilateral theory of conspiracy. Under the bilateral

theory of conspiracy, a supposed agreement between a defendant and a government agent only feigning agreement will not support a conspiracy conviction because there is no agreement and actual agreement is necessary. *Id.* at 360.

¶ 29 The *Breton* court compared the *actus reus* of conspiracy (an agreement to commit a crime) with the *actus reus* of solicitation (an attempt to persuade another to commit a crime) and determined that because of the nature of solicitation, the solicitation statute is based on the unilateral theory, which only requires actual agreement by one of the parties. *Id.* at 361-62. The court ultimately held "[p]rocurement of another to commit murder pursuant to an agreement where a defendant agrees with a government agent feigning agreement is sufficient to support a conviction of solicitation of murder for hire." *Id.* at 362.

¶ 30 Acknowledging *Breton*, Smith argues that he is addressing the solicitation of murder for hire statute's procurement element, not its "its contracting/agreement/command element." According to Smith, because *Breton* only construed the latter, "nothing in it is authority for the 'procurement' element's meaning." We reject this argument and find that *Breton* was not so narrowly focused. Again, the *Breton* court broadly held that, "[p]rocurement of another to commit murder *** where a defendant agrees with a government agent feigning agreement is sufficient to support a conviction of solicitation of murder for hire." *Id.*; see *Cuadrado*, 341 Ill. App. 3d at 714-16 (following *Breton*); *People v. Shepherd*, 2024 IL App (3d) 230283-U, ¶¶ 32-35 (same).

¶ 31 Here, Smith agreed to give Gutter a motorcycle worth $5,000 in exchange for killing Judge Linn and ASA Papa. Like the investigator "hitman" in *Breton*, Gutter's intent was not relevant. The only issue was whether Smith, with the intent that first degree murder be committed, procured someone pursuant to a contract or agreement for money. We find that,

viewing the evidence in the light most favorable to the State, a rational trier of fact could have found that Smith procured Gutter to commit first degree murder pursuant to an agreement for money.

¶ 32    Smith next claims that trial counsel was ineffective when he failed to request a jury instruction defining the word "procure" to mean he received what he wanted, an actual hitman intent on carrying out his plans to murder Judge Linn and ASA Papa. In instructing the jury, the trial judge informed the jury that, with respect to the murder for hire charge, "the defendant procured Andrew Gutter AKA Big Moe to commit the offense of first degree murder pursuant to any contract, agreement, understanding, command, or request for money or anything of value." During deliberations, the jury sent the trial judge a note requesting the definitions of "procure" and "pursuant." The trial judge and parties then discussed the jury's note. The State suggested that the trial judge instruct the jury to refer back to the instructions it had already been given. Defense counsel agreed. The judge then responded, "You have been given the jury instructions and the applicable law, please continue your deliberations." Smith claims that defense counsel's acquiescence was objectively unreasonable and amounted to ineffective assistance. We disagree, as Smith has not shown that his attorney's decision not to request that the jury be instructed on the definition of "procure" amounted to deficient performance.

¶ 33    In determining whether a defendant was denied the effective assistance of counsel, we apply the familiar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defendant such that he was deprived of a fair trial. *Strickland*, 466 U.S. at 687; *People v. Patterson*, 217 Ill. 2d 407,

438 (2005). If the defendant fails to establish either prong, his ineffective assistance claim must fail. *Strickland*, 466 U.S. at 700. Where the facts relevant to an ineffective assistance of counsel claim are not disputed, our review is *de novo*. *People v. Bew*, 228 Ill. 2d 122, 127 (2008).

¶ 34     Jury instructions are necessary to provide the jury with the legal principles applicable to the evidence presented so that it may reach a correct verdict. *People v. Hopp*, 209 Ill. 2d 1, 8 (2004). It is well settled in Illinois that counsel's choice of jury instructions, and the decision to rely on one theory of defense to the exclusion of others, is a matter of trial strategy. *People v. Sims*, 374 Ill. App. 3d 231, 267 (2007). "Such decisions enjoy a strong presumption that they reflect sound trial strategy, rather than incompetence," and therefore, are "generally immune from claims of ineffective assistance of counsel." *People v. Enis*, 194 Ill. 2d 361, 378 (2000). However, the failure to request a particular jury instruction may be grounds for finding ineffective assistance of counsel if the instruction was so critical to the defense that its omission " 'den[ied] the right of the accused to a fair trial.' " *People v. Johnson*, 385 Ill. App. 3d 585, 599 (2008) (quoting *People v. Pegram*, 124 Ill. 2d 166, 174 (1988)).

¶ 35     Smith has not shown his counsel's performance was deficient. The Illinois Pattern Jury Instructions, Criminal, do not provide that an additional definition of procure is required. Furthermore, Smith cites no case, nor have we found one, in which the failure to define "procure" has been considered error. "[W]hen words used in an instruction have a commonly understood meaning *** it is not necessary to define them for the jury by the use of additional instructions. This is especially true when the applicable Illinois Pattern Jury Instructions do not suggest that such an additional definition is necessary." *People v. Bradley*, 192 Ill. App. 3d 387, 393-94 (1989). And, as we explain above, "procure" does not mean that Smith obtained an actual hitman intent on murdering his targets. Therefore, we find that Smith has failed to show that his

attorney's performance was deficient and his ineffective assistance claim must fail.

¶ 36 Smith's citation of *People v. Coots*, 2012 IL App (2d) 100592, is misplaced. In *Coots*, the defendant was convicted of drug-induced homicide, which required the State to prove that the defendant unlawfully delivered heroin to the victim. *Id.* ¶¶ 1, 17. During deliberations, the jury sent a note asking whether it could interpret the term "delivery" to mean "give." (Internal quotation marks omitted.) *Id.* ¶ 16. The court told the jury to refer to the instructions it had been given. *Id.* Defense counsel did not object.

¶ 37 On appeal, the second district of this court found that the defense counsel's acquiescence to the trial court's response prejudiced the defendant because the jury's question, equating "delivery" with "give," showed that the jury "was at least entertaining the belief that defendant could be found guilty for doing no more than handing heroin to [the victim]," which was incorrect. *Id.* ¶ 53. The court therefore found that trial counsel was ineffective for failing to "request that the trial court answer the jury's question and, more specifically, for failing to tender an instruction that would have limited the definition of 'delivery.' " *Id.* ¶ 45. However, unlike *Coots*, there is nothing here to suggest that the jury was equating "procure" with any lesser standard than the law required. Further, unlike *Coots*, there is no pattern instruction defining "procure," and nothing to show that the trial court likely would have accepted defendant's proposed definition.

¶ 38 Smith next argues that the court erred when it failed to suppress the eavesdropping evidence the State sought to admit against him. Smith brought his motion to suppress under section 108A-9 of the Code of Criminal Procedure of 1963 (725 ILCS 5/108A-9 (West 2014)), which allows an aggrieved party to file a motion to suppress any conversation or evidence derived therefrom on the grounds that (1) the conversation was unlawfully overheard and

recorded, (2) the order of authorization or approval under which the device was used or recording was made was improperly granted, or (3) the recording or interception was not made in conformity with the order of authorization. In his motion to suppress, Smith argued that the eavesdropping violated section 14-2 of the Criminal Code of 2012 (720 ILCS 5/14-2 (West 2014)) and that then State's Attorney Alvarez did not personally review the warrant application or explicitly delegate her authority to ASA Golden to review and authorize the warrant application on her behalf, in violation of section 108A-1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/108A-1 (West 2014)). The court denied Smith's motion to suppress the eavesdropping evidence, finding that he "fail[ed] to support even making a *prima facie* case shifting the burden." The court further stated that it was clear "that the application was correctly done pursuant to the statutory requirements."

¶ 39    Here, Smith argues that the State illegally eavesdropped because Illinois law prohibits the recording of a conversation without a counterpart's consent. 720 ILCS 5/14-2(a)(1) (West 2014). He also argues that Gutter's eavesdropping was illegal because it was improperly requested under section 108A-1 (725 ILCS 108A-1(West 2014)). Smith claims that during the State's investigation, undercover officer Gutter secretly recorded Smith but that the judicial order obtained by ASA Michael Golden, allowing for that eavesdropping, was unauthorized under Illinois law. According to Smith, only the elected State's Attorney and two other ASAs were authorized to request a judicial order for eavesdropping and that ASA Golden was not. The State responds that the trial court properly denied Smith's motion to suppress the audio recordings of his conversations with Gutter in the Cook County jail's visiting room because, when those conversations occurred in November and December 2014, the version of the eavesdropping statute that Smith relies on had been found unconstitutional in *Clark*, 2014 IL 115776, ¶ 25.

15

Rather, the version that was in effect at the time allowed Gutter to record his conversations with Smith, without Smith's consent or prior judicial authorization, and therefore the circuit court did not err in denying Smith's motion to suppress the audio recordings. The State further asserts that, in any event, law enforcement officers properly applied for and were granted prior judicial authorization to record the conversations under section 108A-1 (725 ILCS 108A-1 (West 2014)).

¶ 40    "In determining whether a trial court has properly ruled on a motion to suppress, findings of fact and credibility determinations made by the trial court are accorded great deference and will be reversed only if they are against the manifest weight of the evidence." *People v. Slater*, 228 Ill. 2d 137, 149 (2008). This court reviews *de novo* the trial court's decision whether to deny a motion to suppress. *People v. Drain*, 2023 IL App (4th) 210355, ¶ 24.

¶ 41    In March 2014, eight months before the conversations at issue here, the Illinois Supreme Court decided *Clark*, 2014 IL 115776. In *Clark*, the defendant challenged his indictment for two counts of eavesdropping (720 ILCS 5/14-2(a)(1)(A) (West 2010)) on the grounds that the eavesdropping statute violated his due process and first amendment rights. *Clark*, 2014 IL 115776, ¶ 1. At the time, the eavesdropping statute provided in pertinent part:

>      " '(a) A person commits eavesdropping when he:
>
>          (1) Knowingly and intentionally uses an eavesdropping device for the purpose of hearing or recording all or any part of any conversation or intercepts, retains, or transcribes electronic communication unless he does so (A) with the consent of all of the parties to such conversation or electronic communication[.]' " *Id.* ¶ 14 (quoting 720 ILCS 5/14-2(a)(1)(A) (West 2010)).

The statute defined "[c]onversation" as "any oral communication between 2 or more persons regardless of whether one or more of the parties intended their communication to be of a private

nature under circumstances justifying that expectation." 720 ILCS 5/14-1(d) (West 2010); *Clark*, 2014 IL 115776, ¶ 14. The court observed that when the legislature amended the eavesdropping statute in 1994 (Pub. Act 88-677, § 20 (eff. Dec. 15, 1994)), it did so to define "conversation."

> "The purpose of the 1994 amendments was to make clear, in contrast to *Beardsley*'s interpretation, that the consent of all parties to recording a conversation is required, regardless of whether the parties intended their conversation to be private. See 88th Ill. Gen. Assem., Senate Proceedings, Apr. 21, 1994, at 139 (statements of Senator Dillard)."
>
> *Clark*, 2014 IL 115776, ¶ 17.

See *People v. Beardsley*, 115 Ill. 2d 47, 56-57 (1986) (analyzing the pre-1994 statute to find there was no expectation of privacy when a party to a conversation makes a recording of that conversation). The broad definition of the word "conversation" used in section 14-2(a)(1)(A) of the statute (720 ILCS 5/14-2(a)(1)(A) (West 2010)) criminalized the recording of all conversations except in limited circumstances specifically allowed by the statute. Our supreme court held that this prohibition against recording a conversation without all parties' consent was unconstitutionally overbroad under the first amendment and, therefore, facially invalid because it criminalized "a great deal of wholly innocent conduct." *Clark*, 2014 IL 115776, ¶¶ 22-26.

¶ 42    After the *Clark* decision, section 14-2(a)(1)(A) (720 ILCS 5/14-2(a)(1)(A) (West 2010)) was rendered void *ab initio*. See *People v. Blair*, 2013 IL 114122, ¶ 28 (when a statute is held facially unconstitutional, it is unconstitutional in all its applications and is void *ab initio*). While such a finding does not render a statute nonexistent, it does mean that the statute was constitutionally infirm from the moment of its enactment and is, therefore, unenforceable. *Id.* Therefore, at the time the conversations between Gutter and Smith were recorded in this case, the version of the eavesdropping statute that Smith cites was not in effect.

17

¶ 43     Following our supreme court's decision in *Clark*, the Illinois legislature added the "private conversation" requirement to the eavesdropping statute to provide that eavesdropping required a surreptitious recording of an oral communication, "when one or more of the parties intended the communication to be of a private nature under circumstances reasonably justifying that expectation." See 720 ILCS 5/14-1(d) (West 2014). This amendment went into effect on December 30, 2014, after the recorded conversations between Gutter and Smith. See Pub. Act 98-1142, § 5 (eff. Dec. 30, 2014) (amending 720 ILCS 5/14-1(d)). Because the legislature did not enact an amended version of section 14-1(d) until after Smith's conversations with Gutter, we are required to apply the version of the statute (section 14-2(a)(1)(A)) in effect at the time the recording was made, which is the pre-1994 version. See *Blair*, 2013 IL 114122, ¶ 30; *People v. Rodriguez*, 313 Ill. App. 3d 877, 886-87 (2000).

¶ 44     The pre-1994 version (Ill. Rev. Stat. 1991, ch. 38, ¶ 14-1) did not define the term "conversation." Subsection 14-2 stated in relevant part that

> "A person commits eavesdropping when he:
>
> (a) Uses an eavesdropping device to hear or record all or any part of any conversation unless he does so (1) with the consent of all of the parties to such conversation or (2) in accordance with Article 108A or Article 108B of the 'Code of Criminal Procedure of 1963[.]' " *Id.* ¶ 14-2(a).

Without a specific definition of conversation, our supreme court interpreted subsection 14-2 to mean that " 'no eavesdropping occurs where an individual to whom statements are made or directed records them, even without the knowledge or consent of the person making the statements, because the declarant does not intend to keep his statements private *vis-a-vis* that individual.' " *People v. Herrington*, 163 Ill. 2d 507, 510-11 (1994) (quoting *Bender v. Board of*

*Fire & Police Commissioners of Dolton*, 183 Ill. App. 3d 562, 565 (1989)); see *Beardsley*, 115 Ill. 2d at 56-57 (there is no expectation of privacy when a party to a conversation makes a recording of that conversation). Applying the pre-1994 law to this case, the statements made by Smith and recorded by Gutter, who was a party to the conversation and consented to its recording, did not constitute eavesdropping under the Illinois eavesdropping statute. Hence, the trial court did not err when it declined to suppress the recordings.

¶ 45    In his motion for clarification filed after oral argument in this case, which we have taken with the case, Smith acknowledges that the eavesdropping in this case was not a criminal offense under the pre-1994 version of the Criminal Code of 1961. Nonetheless, he argues that it was unauthorized under section 108A-1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/108A-1 (West 2014)) and was therefore subject to suppression under section 108A-9(a)(2) of the Code of Criminal Procedure of 1963 (*id.* § 108A-9(a)(2)). We disagree.

¶ 46    Under article 108A, when there is reasonable cause to believe that a person has committed or is planning to commit a felony, law enforcement may apply for, and a judge may grant, authorization to record a conversation with one party's consent if there is reasonable cause to believe that the conversation will concern that offense. *Id.* §§ 108A-1, 108A-4. The application must be "authorized" by "[t]he State' Attorney or an Assistant State's Attorney authorized by the State's Attorney." *Id.* § 108A-1. In addition, it must "state the applicant's authority to make such application" and identify the "law enforcement officer making the application and the State's Attorney authorizing the application." *Id.* § 108A-3(a)(1). Undoubtedly, all of these conditions were satisfied here. The application to record Gutter's conversation with Smith identified Officer Raher as the law enforcement officer making the application, stated that Raher had been authorized by the State's Attorney to make the

application and referred to and attached the "State's Attorney's Authorization" that was signed by ASA Golden with "the authority and consent of" State's Attorney Alvarez. At the suppression hearing, the State proffered that ASA Golden "was authorized," as he was "a deputy in the Special Prosecutions" division of the State's Attorney's Office, and was following a "longstanding policy" that had "existed for decades" and "has continued to sign consensual overhears dozens and dozens of times." Smith has provided no evidence to suggest that ASA Golden was not authorized by the State's Attorney to make the application. Therefore, we find that the trial court properly denied Smith's motion to suppress on this ground.

¶ 47    Smith next argues that the State improperly impeached him with his post-arrest silence; improperly admitted excessive prior conviction evidence, which allowed for an improper inference of criminal propensity; offered irrelevant evidence of Smith's state of mind; inflamed the jury with evidence of the complaining witness's state of mind; and, in closing argument, urged the jury to identify with the complaining witness. The State argues that Smith has forfeited these arguments because he failed to object at trial and did not raise these claims in his posttrial motion. "[T]he presence of both a trial objection and a written post-trial motion raising the issue are necessary to preserve an issue for review." *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Failure to properly preserve an issue results in forfeiture on appeal. *Id.*

¶ 48    Smith acknowledges that he did not object or raise these issues in his posttrial motion. Smith does not argue that plain error applies to any single error but instead argues that the errors cumulatively prejudiced him. He then equates prejudice under *Strickland* with the first prong of plain error, without any discussion of the plain error requirements, and concludes that cumulative prejudice denied him a fair trial. However, Smith has cited no authority to support the contention that, by combining multiple forfeited errors, a defendant may, via a cumulative-error argument,

transform his claim into one that is preserved. See *People v. Brown*, 2023 IL App (4th) 220476, ¶ 39 ("We are aware of no authority *** to support the contention that, by combining multiple unpreserved, forfeited errors, a defendant may transform his claim into one that is preserved or not forfeited." (Internal quotation marks omitted.)). Consequently, we find these issues are forfeited.

¶ 49    Finally, Smith argues that this court should remand to the trial court because the trial judge did not conduct an adequate *Krankel* inquiry into his claims of ineffective assistance of counsel. See *People v. Krankel*, 102 Ill. 2d 181 (1984). After post-sentencing proceedings, Smith filed a *pro se* motion alleging that counsel was ineffective for failing to seek exculpatory documents, particularly State witness Quentin Davis's jail records, and failing to subpoena evidence that Smith had, in the past, concocted schemes similar to that which he testified he planned in this case. After post-sentencing proceedings, counsel called the trial judge's attention to Smith's complaint, and the judge then said, "I saw that, and I've reviewed those motions. It's within the Court's discretion on those type of motions to allow or deny argument. I'm going to rule on the motions. The motions are denied." Smith then asked the court if he could argue his motion, and told the court that defense counsel sabotaged him and offered no fight, so he wanted to litigate *pro se*. Smith said that counsel had failed to subpoena evidence, that the State had used this counsel's failure to subpoena to its benefit, that he did not trust counsel, and that forcing him to remain with counsel would do everybody no good. The court then said, without further inquiry, "on those motions I am denying those without argument." The State agrees with Smith that the trial court did not conduct an adequate preliminary inquiry into Smith's allegations of ineffective assistance. So do we.

¶ 50    A *Krankel* hearing should occur "when a defendant raises a *pro se* posttrial claim of

ineffective assistance of trial counsel." *People v. Jolly*, 2014 IL 117142, ¶ 29. A *Krankel* hearing "serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims" (*People v. Patrick*, 2011 IL 111666, ¶ 39) and "is intended to promote consideration of *pro se* ineffective assistance claims in the trial court and to limit issues on appeal" (*id.* ¶ 41). See *People v. Roddis*, 2020 IL 124352, ¶ 34.

¶ 51    When a defendant files a *pro se* posttrial motion alleging trial counsel's ineffectiveness, the court must conduct a preliminary inquiry to examine the factual basis of the claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). A preliminary *Krankel* hearing "should operate as a neutral and nonadversarial proceeding." *Jolly*, 2014 IL 117142, ¶ 38. The trial court is not automatically required to appoint new counsel to assist the defendant; rather, the court should first examine the factual basis of the defendant's claim. See *Moore*, 207 Ill. 2d at 77-79. There are three ways in which a trial court may conduct its examination: (1) the court may ask trial counsel about the facts and circumstances related to the defendant's allegations, (2) the court may ask the defendant for more specific information, and (3) the court may rely on its knowledge of counsel's performance at trial and "the insufficiency of the defendant's allegations on their face." *Id.* However, "[t]here is no set format for how an initial inquiry into a defendant's *pro se* allegations of ineffective assistance of counsel should be conducted." *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 85. A court need not expressly state that it is conducting a *Krankel* inquiry. *People v. Short*, 2014 IL App (1st) 121262, ¶ 121.

¶ 52    If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. *Roddis*, 2020 IL 124352, ¶ 35. However, new counsel should be appointed if the allegations show

22

possible neglect of the case. *Id.* Newly appointed counsel can independently evaluate the *pro se* claim and avoid the conflict of interest that defendant's trial counsel would experience in trying to justify his or her actions contrary to the defendant's position. *Id.* ¶ 36. Whether the trial court properly conducted a *Krankel* preliminary inquiry presents a legal question that we review *de novo*. *Id.* ¶ 33.

¶ 53    While it is true that a court may rely on its knowledge of counsel's performance at trial and "the insufficiency of the defendant's allegations on their face," there must be "some type of inquiry into the underlying factual basis, if any, of a defendant's *pro se* posttrial claim of ineffective assistance of counsel." *Moore*, 207 Ill. 2d at 78-79 ("During this [preliminary inquiry], some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is *** usually necessary in assessing what further action, if any, is warranted on a defendant's claim. Trial counsel may simply answer questions and explain the facts and circumstances surrounding the defendant's allegations."). Because no such inquiry or investigation occurred in this case, we must remand the cause to the trial court for a preliminary investigation into Smith's claims to determine whether the appointment of new counsel to effectively present his claims is appropriate and necessary. See *People v. Peacock*, 359 Ill. App. 3d 326, 339 (2005) (recognizing that the trial court was not in a position to evaluate the defendant's *pro se* claim of ineffective assistance for failure to subpoena witnesses simply by relying on facts within its knowledge where the record did not reveal who the witnesses were or what they would have said on the stand); *People v. McLaurin*, 2012 IL App (1st) 102943, ¶ 53 (remand for the limited purpose of allowing the trial court to make a more complete inquiry into defense counsel's efforts "to investigate" the witness and "secure his testimony for the second trial," was needed); *People v. Roberson*, 2021 IL App

(3d) 190212, ¶ 19 (remanding for a proper preliminary *Krankel* hearing); *Moore*, 207 Ill. 2d at 81.

¶ 54    If, after a hearing, the trial court determines the claim lacks merit or pertains to trial strategy, it can deny the motion. If the claim is determined to have some merit, the court can proceed to a second stage adversarial hearing. If Smith is unsuccessful at either stage, he can appeal if he chooses. See *Krankel*, 102 Ill. 2d at 189.

¶ 55                              III. CONCLUSION

¶ 56    Based on the foregoing, we affirm in part and vacate in part and remand the cause with directions.

¶ 57    Affirmed in part and vacated in part; cause remanded with directions.

---

### *People v. Smith*, 2025 IL App (1st) 220116

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15-CR-2534; the Hon. Brian Telander, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Michael H. Orenstein, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Katherine M. Doersch and Eric M. Levin, Assistant Attorneys General, of counsel), for the People. |

---